**J.L. SPOONS, INC., Plaintiff,**

v.

**CITY OF BRUNSWICK, Defendant.**

**No. 1:99CV0477.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 20, 1999.

---

J. Michael Murray, Steven D. Shafron, Berkman, Gordon, Murray & DeVan, Cleveland, OH, for J.L. Spoons, Inc., plaintiff.

Timothy T. Reid, Reid, Berry & Stanard, Cleveland, OH, for City of Brunswick, defendant.

## MEMORANDUM AND ORDER

ALDRICH, District Judge.

Plaintiff J.L. Spoons, Inc. ("J.L.Spoons"), doing business as Tiffany's Cabaret, brings this action against the City of Brunswick, Ohio ("Brunswick" or "the City") pursuant to 42 U.S.C. § 1983. J.L. Spoons challenges the constitutionality of Ordinance No. 169–98, which provides for the licensing, location, and regulation of sexually oriented businesses in the City of Brunswick. On April 12, 1999, a hearing was conducted regarding J.L.

Spoons' motion for a preliminary injunction (doc. # 13). The City filed a written response to that motion on April 19, 1999. For the reasons that follow, this Court grants the plaintiff's motion for a preliminary injunction in part, and enjoins the City from enforcing §§ 4–12, § 16(B), and § 18 of the Ordinance.[1]

## I.

This case arises in the context of prior litigation between J.L. Spoons and the City of Brunswick. J.L. Spoons is the operator of Tiffany's Cabaret, a nightclub located in Brunswick that features live performances by female dancers who, in the course of their performances, appear topless and in G-strings. In December of 1997, J.L. Spoons and its property owner filed a lawsuit against the City to challenge the constitutionality of Ordinance 150–96, a precursor to the ordinance at issue here. On June 1, 1998, this Court held that the licensing and location provisions of Ordinance 150–96 violated the First Amendment, and permanently enjoined the City from enforcing those provisions. On August 21, 1998, this Court concluded that both the remainder of Ordinance 150–96 and the entire measure the City had passed to replace it, Ordinance 67–98, were void because they had been passed in a manner contrary to the Brunswick Charter.[2]

On February 22, 1999, the City adopted Ordinance 169–98 as a successor to the ordinances that had been invalidated. Like the previous regulations, the stated purpose of Ordinance 169–98 is "to regulate sexually oriented businesses in order to promote the health, safety, morals, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious location and concentration of sexually oriented businesses within the City." Ord. 169–98 § 1(A). The ordinance, which contains twenty-three separate sections, establishes a comprehensive civil and criminal scheme regarding the licensing, zoning, and substantive operation of sexually oriented businesses. While Brunswick re-enacted numerous provisions from the previous ordinances, Brunswick also incorporated a number of amendments into Ordinance 169–98. For example, the definition of a "sexually oriented business" was expanded beyond adult cabarets to include adult bookstores, adult arcades, adult video stores, adult movie theaters, escort agencies, nude model studios, and "sexual encounter centers." See Ord. 169–98 § 3.

Ordinance 169–98 went into effect on March 24, 1999. Just prior to that date, J.L. Spoons filed this lawsuit, claiming that the regulation violates Ohio law as well as the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The plaintiff challenges the constitutionality of the ordinance both on its face and as applied to the operation of Tiffany's Cabaret.[3]

## II.

This Court must consider four factors in determining whether to issue a preliminary injunction: (1) whether J.L.

---

1. The parties have reserved the right to introduce more evidence and otherwise proceed to trial in this case upon resolution of the preliminary injunction motion. Therefore, it does not appear at this time that the hearing on the preliminary injunction motion was consolidated with a trial on the merits as provided for by Federal Rule of Civil Procedure 65(a)(2).

2. In the previous case, this Court also found that both Ohio Administrative Code § 4301:1–1–52 and Brunswick Codified Ordinance § 612.12 were facially overbroad in violation of the First Amendment. With respect to the ordinance currently being challenged, it appears that, in accordance with the Brunswick Charter, the ordinance was read three times before it was enacted into law.

3. Ordinance 169–98 defines an "adult cabaret" as a "nightclub, bar, restaurant, or similar commercial establishment which regularly features: (a) persons who appear in a state of nudity or seminude; or (b) live performances which are characterized by the exposure of 'special anatomical areas' or by 'specified sexual activities' ...." Ord. 169–98 § 2(3). Tiffany's Cabaret falls within this definition of an adult cabaret.

Spoons has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to J.L. Spoons; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief. *See NAACP v. City of Mansfield,* 866 F.2d 162, 166 (6th Cir.1989). Each of these factors will be discussed in turn.

### III.

### A. Substantial Likelihood of Success on the Merits.

J.L. Spoons argues that most of the sections in Ordinance 169–98 suffer from constitutional infirmities. The challenged sections can be categorized as those pertaining to (1) the licensing scheme and mandatory inspections; (2) zoning requirements; (3) hours of operation; and (4) nudity regulations.

1. *Licensing Scheme and Mandatory Inspections* (Ord. 169–98 §§ 4–11).

■ It is now well-settled that erotic dancing, even when it involves nudity, constitutes expressive activity "within the outer perimeters of the First Amendment." *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Any licensing scheme aimed at such expression amounts to a "prior restraint" upon one's First Amendment rights. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 225, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Freedman v. Maryland,* 380 U.S. 51, 57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Prior restraints are presumptively invalid because they typically involve "two evils": (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) "the risk of indefinitely suppressing permissible speech" when a licensing law fails to provide for the prompt issuance of a license. *FW/PBS,* 493 U.S. at 227, 110 S.Ct. 596. Therefore, to comport with the First Amendment, a licensing scheme like the one at issue here must

remove discretion from government officials and contain two procedural safeguards: (1) "the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained," and (2) "there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *Id.* at 228, 110 S.Ct. 596.

At first blush, Ordinance 169–98 does not appear to grant standardless discretion to government decisionmakers regarding the issuance of a license. The licensing sections require Brunswick to issue a license to an applicant unless certain criteria have not been met. For example, § 5(C) obligates the City to issue a sexually oriented business license within 30 days "unless it is determined" that the applicant is under 18 years of age, is overdue in business taxes or fines, or has failed to complete the application, or has falsely answered a question on the application, etc. *See* Ord. 169–98 § 5(C)(1)-(8).

■ However, a serious problem arises with respect to § 5(C)(6). This section prohibits the issuance of a license when the premises "have not been approved by the health department, fire department, and the building official." The City of Brunswick does not have its own health department; rather, the City must rely on the Medina County Health Department to perform the necessary inspections. J.L. Spoons argues that the City has no control over the County Health Department, and, consequently, cannot guarantee that the health department will approve the premises within 20 days. The City has failed to rebut this concern. Thus, although § 5(E) ostensibly requires the health department to complete a certification of the premises within 20 days of the date of the application, this time limit is illusory. *See East Brooks Books, Inc. v. City of Memphis,* 48 F.3d 220, 224 (6th Cir.), *cert. denied,* 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 198 (1995) (failure to place meaningful time

limitations on decisionmaker "is a form of unbridled discretion").

 Even more troublesome is the fact that the ordinance fails to provide for prompt judicial review of a decision adverse to an applicant. Section 10(D) indicates that an applicant or licensee "may seek prompt judicial review" of the denial, suspension, or revocation of a license "in any court of competent jurisdiction." In effect, the ordinance requires an aggrieved applicant or licensee to file a civil lawsuit pursuant to Chapter 2506 of the Ohio Revised Code to obtain judicial review. This requirement suffers from two fundamental flaws.

First, the Ohio Supreme Court has held that "for an administrative act to be appealable under R.C. 2506.01 such act must be the product of quasi-judicial proceedings." *M.J. Kelley Co. v. City of Cleveland,* 32 Ohio St.2d 150, 290 N.E.2d 562, 564 (1972). Brunswick's licensing scheme does not involve "quasijudicial proceedings;" it does not incorporate either hearings, the "opportunity to introduce testimony through witnesses," or any other proceedings of a legal nature. *Id.* at 565. Without citing any case law, the City seems to deny that Chapter 2506 fails to provide for judicial review in this case.[4] The City instead stresses that the ordinance allows for the issuance of "provisional licenses" and otherwise maintains the status quo while appeals are pending. While this latter point may be correct,[5] it does not cure the problem that aggrieved applicants and licensees will be unable to appeal Brunswick's decisions in the first place.

Second, as this Court indicated with respect to the preceding ordinance, the procedures provided for in Chapter 2506 do not provide a constitutionally adequate avenue of "prompt" judicial review. *See J.L. Spoons, Inc. v. City of Brunswick,* 18 F.Supp.2d 775, 779 (N.D.Ohio 1998) (citations omitted). For example, Chapter 2506 does not require a court to rule on the merits of an administrative appeal within a specified period of time; "rather, the appeal proceeds as any other civil action proceeds." *Id.* Thus, even if this Court were to assume that state courts have jurisdiction over these appeals, there is no guarantee that judicial review would be prompt. *See, e.g., East Brooks Books,* 48 F.3d at 225 (noting that "potential delays of over five months are impermissible").

Because Ordinance 169–98 fails to ensure the prompt issuance of a license and prompt judicial review, this Court finds that the plaintiff is substantially likely to succeed on the merits of this claim. J.L. Spoons has shown a substantial likelihood that the licensing scheme— §§ 4–11 of the ordinance—contravenes the requirements of the First Amendment.

J.L. Spoons also argues that separate and apart from any First Amendment concerns, § 7 of the ordinance violates the Fourth Amendment. This section, which is part of the licensing scheme, requires that:

> An applicant or licensee shall permit representatives of the Police Department, County Health Department, Fire Department, Zoning Department or other City departments or agencies to inspect the premises of a sexually oriented business for the purpose of insuring compliance with the law, at any time it is occupied or open for business.

---

4. Without further explanation, Brunswick avers that it "is not relying upon the prompt judicial review under Ohio Revised Code." Defendant's Brief at 16. Presumably, the City means to say that even if review under the Ohio Revised Code is not prompt, the ordinance maintains the status quo through the issuance of provisional licenses.

5. Unlike the ordinance previously invalidated, Ordinance 169–98 contains provisions designed to ensure that the status quo is maintained while appeals are pending. *See* Ord. 169–98 § 10(D)(1)-(5). These new provisions constitute a significant improvement, but, as discussed in the text, they fail to eradicate a separate infirmity: the ordinance does not actually provide for judicial review, prompt or otherwise.

Ord. 169–98 § 7(A). Failure to permit such inspections constitutes a first degree misdemeanor and results in the suspension of one's license. Ord. 169–98 §§ 7(B), 9(A)(2).

As an initial matter, this Court assumes that the plaintiff has standing at this time to challenge § 7 under the Fourth Amendment. There is no dispute that the threat of enforcement of this section against J.L. Spoons is real and imminent. *See, e.g., City of Houston v. Hill,* 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (plaintiff who shows genuine threat of enforcement may seek prospective relief). The limitless nature of the inspections provided for in the section shows that the regulation poses a threat of actual, primarily economic, injury to the plaintiff. Most importantly, because § 7 is part of the licensing scheme, it impinges on both the First and Fourth Amendments. And, as the United States Supreme Court has stated, facial challenges are permitted in the First Amendment context because "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

▇▇▇ This Court agrees with the plaintiff that § 7 violates the Fourth Amendment's prohibition on unreasonable searches. Administrative searches "are significant intrusions upon the interests protected by the Fourth Amendment," and generally require that a government official possess "a suitably restricted search warrant." [6] *Camara v. Municipal Court of the City and County of San Francisco,* 387 U.S. 523, 534, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). This warrant requirement "applies to commercial premises as well as homes." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Although there is a narrow exception to the warrant requirement for administrative searches conducted in "closely regulated" industries, sexually oriented businesses do not qualify as highly regulated industries. *See, e.g., New York v. Burger,* 482 U.S. 691, 700–01, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (finding vehicle dismantling businesses to be highly regulated, like mining and firearms industries). Indeed, because sexually oriented businesses enjoy a degree of First Amendment protection, the government probably could not "closely regulate" them under the *Burger* line of cases without running afoul of the First Amendment.[7]

Because § 7 mandates warrantless, and completely discretionless, searches, this Court concludes that J.L. Spoons is highly likely to prevail in its argument that § 7 cannot be squared with the Fourth Amendment.[8] Although § 7 rises and falls

---

6. The City, citing no case law and proffering no legal argument, simply asserts that "[a]n inspection of the premises is not the same as the search of a premises." Defendant's Brief at 12. Quite obviously, in a long line of cases since at least *Camara,* the Supreme Court has recognized that administrative inspections constitute "searches" within the meaning of the Fourth Amendment.

7. In any event, even if this Court were to assume that sexually oriented businesses were "closely regulated" for purposes of the Fourth Amendment, the ordinance clearly fails to satisfy the criteria for warrantless administrative searches set forth in *Burger.* Section 7 is virtually limitless, and fails to curb the discretion of inspectors "in time, place, and scope." *Burger,* 482 U.S. at 702–03, 107 S.Ct. 2636.

8. This conclusion is particularly compelled by the fact that the regulation is not merely a civil enforcement scheme, but actually criminalizes the refusal to permit a City representative to inspect the property. Although neither party raises the issue, this Court notes that § 7—and, moreover, the other sections within the licensing scheme—could also be assessed under the First Amendment analysis set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *See, e.g., East Brooks Books,* 48 F.3d at 225–26 (analyzing provisions of licensing scheme under *O'Brien* content-neutrality test). Because this Court finds a substantial likelihood that the licensing scheme constitutes an unlawful prior restraint, it is unnecessary to decide whether each section within the scheme passes muster under *O'Brien.* Similarly, this

with the licensing scheme in any event, its constitutionality is dubious under the Fourth Amendment as well as the First Amendment.

2. *Location Provision* (Ord. 169–98 § 12).

] Section 12 of the ordinance restricts the location of sexually oriented businesses. Rather than disputing the constitutionality of § 12 at this time in the litigation, J.L. Spoons argues that the regulation violates the non-conforming use provision of Ohio Revised Code § 713.15. This Court agrees.

Section 12(H) reads as follows:

Any sexually oriented business lawfully operating on the date of passage of this ordinance that is in violation of subsection A through F of this Section shall be permitted to continue for a period not to exceed one year, unless sooner terminated for any reason or voluntarily discontinued for a period of thirty (30) days or more. Such nonconforming uses shall not be increased, enlarged, extended, or altered except that the use may be changed to a conforming use.

Ord. 169–98 § 12(H). Through this language, Brunswick is requiring the cessation of prior non-conforming uses of land within one year of the date the ordinance was passed. However, this requirement contravenes both the Ohio Constitution and Ohio Revised Code § 713.15. Section 713.15 prohibits retroactive zoning ordinances, stating that "[t]he lawful use of any dwelling, building, or structure and or any land or premises, as existing and lawful at the time of enacting a zoning ordinance ..., may be continued ...." O.R.C. § 713.15. Further, Article XVIII, § 3 of the Ohio Constitution prohibits municipalities from adopting regulations that conflict with the state's general laws.

] The City does not dispute that J.L. Spoons' prior use of the land fails to conform with the requirements of § 12. Rather, the City asserts that the ordinance "is not a zoning ordinance, but is instead, a licensing and business regulation ordinance." Defendant's Brief at 13. This argument is thoroughly unavailing. Although the bulk of Ordinance 169–98 is devoted to the licensing scheme, § 12 is unequivocally a zoning regulation.[9] The section prescribes where businesses may be located, and this is the very essence of zoning. *Accord Avenue Grille, Inc. v. Rootstown Township,* slip op., No. 5:94CV0067 (N.D. Ohio April 19, 1995) (O'Malley, J.). Section 12(A) criminalizes the operation of a sexually oriented business "in a zoning district other than in a zoning district where entertainment is permitted." The fact that the City often chose to use the word "location" rather than "zoning" does not transform § 12 into something other than a zoning regulation.

This Court concludes that § 12(H) conflicts with state law, and, accordingly, that J.L. Spoons will prevail on its claim that the section cannot lawfully be applied to its operation of Tiffany's Cabaret.[10]

Court need not separately consider whether the sub-sections pertaining to employee licenses (as opposed to business licenses) are constitutional.

9. The City indicates that besides Ordinance 169–98, two other Brunswick ordinances exist that place zoning requirements on sexually oriented businesses. Those other ordinances are not before this Court, and there is no evidence that they are relevant to the issues being adjudicated here.

10. It is worth noting that Brunswick re-enacted some language in § 12 that this Court had found unconstitutionally vague in the first case. Specifically, the City re-enacted the undefined term "entertainment" in § 12(A), the definition of a "public or private educational facility" in § 12(B)(2), and the undecipherable language in § 12(I). Because J.L. Spoons has shown that § 12 may not be applied retroactively, this Court need not reach a vagueness challenge at this time. Similarly, there is no need to assess whether § 12 allows for reasonable avenues of communication or otherwise comports with the Supreme Court's decision in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

3. *Provision Regarding Hours of Operation* (Ord. 169–98 § 18).

J.L. Spoons also argues that state law preempts § 18 of the ordinance. Section 18 prohibits all sexually oriented businesses from remaining open later than 1:00 a.m. The regulation does not distinguish between businesses that have liquor licenses and those which do not.

As long ago as 1944, the Ohio Supreme Court held that a municipality may not restrict the sale of alcohol in a manner that conflicts with the state's general laws. *Neil House Hotel Co. v. City of Columbus,* 144 Ohio St. 248, 58 N.E.2d 665, 667–68 (1944). The Court has since held that "where a business entity operating in a commercial or industrial district has been issued a valid permit for the sale of alcoholic beverages by the Ohio Department of Liquor Control, a municipality is without authority to extinguish privileges arising thereunder through the enforcement of zoning regulations." *City of Westlake v. Mascot Petroleum Co., Inc.,* 61 Ohio St.3d 161, 573 N.E.2d 1068, 1073 (1991) (invalidating ordinance that prohibited sale of alcohol at service stations).

As Brunswick concedes,[11] the Ohio Department of Liquor Control granted the plaintiff a D1, 2, 3, 3a, and 6 permit. This permit authorizes Tiffany's Cabaret to sell alcoholic beverages until 2:30 a.m., in accordance with general state law. It is readily apparent that the ordinance's prohibition on remaining open past 1:00 a.m. conflicts with the license given to the plaintiff by the state. And, when a local ordinance "restricts an activity which a state license permits, the ordinance is in conflict with a general law of the state and violates Section 3, Article XVIII of the Ohio Constitution." *Ohio Ass'n of Private Detective*

*Agencies, Inc. v. City of North Olmsted,* 65 Ohio St.3d 242, 602 N.E.2d 1147, 1150 (1992).

Therefore, this Court concludes that J.L. Spoons has demonstrated a substantial likelihood of success on its claim that § 18 of the ordinance violates the plaintiff's rights under the Ohio Constitution.[12]

4. *Regulations Concerning Public Nudity* (Ord. 169–98 § 16).

a. *Standing.* Lastly, J.L. Spoons challenges § 16 of the ordinance, which contains four separate criminal provisions regarding the conduct of employees and patrons in sexually oriented businesses. Although neither party addresses the issue, this Court finds it appropriate to discuss the plaintiff's standing to attack § 16.[13]

J.L. Spoons is, of course, not itself a person, employee, or customer under this section of the ordinance. Nonetheless, this Court concludes that J.L. Spoons enjoys third party standing in this context. To establish third party standing, J.L. Spoons must show that (1) it faces a threat of actual injury such that it has a sufficiently concrete interest in the controversy; (2) it has a close relationship with the third party; and (3) there is some hindrance to the third party's ability to protect his or her own interests. *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

First, J.L. Spoons has persuasively argued that the prohibitions in § 16 directly impinge its own First Amendment rights, as it sponsors the very performances that the section is designed to regulate. The plaintiff has also shown, for example, that the 10–foot distance requirement in

---

11. At the hearing on the preliminary injunction motion, Brunswick stipulated to the fact that the plaintiff possesses a liquor permit authorizing Tiffany's to sell alcohol until 2:30 a.m.

12. Based on this conclusion, this Court need not reach the plaintiff's argument that § 18 amounts to a content-based restriction upon

speech and an invalid time, place, or manner restriction.

13. The parties do dispute the plaintiff's standing to challenge the employee licensing provisions; however, because the entire licensing scheme is interconnected, those provisions did not need to be analyzed separately from the business licensing provisions.

§ 16(B) seriously threatens the cabaret's economic viability. Second, there can be no doubt that J.L. Spoons maintains a very close relationship with its dancers, and, to a lesser extent, with its patrons. Indeed, the First Amendment interests shared by J.L. Spoons and its performers are virtually identical, such that J.L. Spoons " 'is fully, or very nearly, as effective a proponent of the right' " as the dancers. *Id.* at 413, 111 S.Ct. 1364 (citation omitted) (defendant has standing to raise constitutional claims of excluded jurors); *see also Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (beer vendor has standing to raise equal protection claim of male customers). Finally, the cabaret's customers are very unlikely to litigate their own rights, and the dancers are unlikely to run the risk of criminal prosecution to assert their First Amendment rights.

J.L. Spoons's rights are inextricably bound with the rights of its employees and patrons. And, as a practical matter, the resolution of this lawsuit will directly affect the rights of these third parties. Therefore, J.L. Spoons has standing to challenge § 16 of the ordinance.

 In addition, under an exception to traditional standing requirements, J.L. Spoons may challenge § 16 as facially overbroad in violation of the First Amendment. This exception applies in First Amendment cases "to ensure that an overbroad statute does not act to 'chill' the exercise of rights guaranteed protection." *Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 135 (6th Cir.1994) (quotation and citations omitted). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). J.L. Spoons also has standing to challenge § 16 on grounds of overbreadth.

b. *Applicable analysis.* As stated previously, J.L. Spoons, through its dancers and patrons, enjoys "a degree of First Amendment protection" in presenting erotic dancing at its cabaret. *Barnes,* 501 U.S. at 581, 111 S.Ct. 2456 (Souter, J., concurring). Although the First Amendment protects erotic dance that is enhanced by nudity, such expressive activity falls "within the outer perimeters of the First Amendment," *id.* at 566, 111 S.Ct. 2456, and is generally afforded less protection than, for example, pure political speech.

 J.L. Spoons argues that § 16 constitutes a content-based restriction upon its right to present a non-obscene, artistic message. According to J.L. Spoons, the ordinance targets businesses that present a particular type of speech: erotic, but non-obscene, expression. The City, on the other hand, argues that the regulation is a content-neutral mechanism for regulating the harmful secondary effects associated with adult entertainment businesses. Viewing the language of Ordinance 169–98 in its entirety, the regulation cannot be properly analyzed as a content-based restriction upon speech. Although the ordinance applies only to sexually oriented businesses, its purpose is to prevent the "adverse secondary effects of adult uses on the community." Ord. 169–98 § 1(B). The case law is clear that such regulations "are to be *treated* like content-neutral regulations." *Richland Bookmart, Inc. v. Nichols,* 137 F.3d 435, 440 (6th Cir.1998) (emphasis in original). As a regulation designed to curb prostitution, the spread of communicable diseases, and other such secondary effects, the ordinance is best viewed as a content-neutral, "time, place, or manner" restriction upon First Amendment activities. *See Barnes,* 501 U.S. at 566, 111 S.Ct. 2456.

 Such content-neutral restrictions are analyzed under the four-part test enunciated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Under this test, the regulation

must (1) be within the government's constitutional power; (2) further an important or substantial governmental interest; (3) be justified by an interest unrelated to the suppression of free expression; and (4) ensure that the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 376–77, 88 S.Ct. 1673; *Barnes,* 501 U.S. at 567, 111 S.Ct. 2456. Moreover, application of a law like Ordinance 169–98 to a cabaret that presents erotic dancing must be based on the state's "substantial interest in combating the secondary effects of adult entertainment establishments." *Barnes,* 501 U.S. at 582, 111 S.Ct. 2456 (Souter, J., concurring); *see also Triplett Grille,* 40 F.3d at 134 (Justice Souter's *Barnes* concurrence is based on narrowest grounds and is therefore binding opinion).

■ Applying this analysis to the case at bar, there is no dispute that promulgation of the ordinance, and § 16 in particular, is within the City's police powers. *See Barnes,* 501 U.S. at 567, 111 S.Ct. 2456. With respect to the second and third prongs of the *O'Brien* test, it is evident that the City is concerned with the harmful secondary effects of sexually oriented businesses. Section 1 lists a variety of negative effects that the City wishes to control, such as the risk of crime and disease. Although there is no evidence in the record of increased crime in the location of the plaintiff's business, "legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects, [and a city] could reasonably conclude that forbidding nude entertainment ... furthers its interest in preventing prostitution, sexual assault, and associated crimes." *Id.* at 584, 111 S.Ct. 2456 (Souter, J., concurring). In light of *Barnes,* then, § 16 of the ordi-

nance satisfies the second and third requirements of *O'Brien.*[14]

■ The fourth *O'Brien* condition, that the incidental restriction upon freedom of expression be no greater than essential, is satisfied so long as the regulation is "narrowly tailored." *Id.* at 572, 111 S.Ct. 2456. That is, § 16 must promote the City's interest in curbing harmful secondary effects, and may not result in a burden on speech that is substantially broader than necessary to achieve the City's goal. *See Threesome Entertainment v. Strittmather,* 4 F.Supp.2d 710, 720–21 (N.D.Ohio 1998) (O'Malley, J.). This Court finds its appropriate to assess each sub-part of § 16 separately for compliance with the fourth prong of *O'Brien.*

c. *§ 16(A)—Appearing in state of nudity.* Section 16(A) declares, "It shall be a second degree misdemeanor for a person who knowingly and intentionally in a sexually oriented business, appears in a state of nudity or depicts specified sexual activities." The ordinance elsewhere defines "nudity" as the showing of specified anatomical areas "with less than a fully opaque covering." Ord. 169–98 § 2(12). "Specified sexual activities" means fondling or "erotic touching" of certain areas, actual or simulated sex acts, and "excretory functions" performed in connection with such acts. *Id.* at § 2(19).

■ This Court first rejects J.L. Spoons' argument that § 16(A) is unconstitutionally vague. Although the section's grammar is incorrect, it can only be read to prohibit appearing in a state of nudity and depicting sexual activities.[15] Persons of ordinary intelligence do not need to guess at the section's meaning, and could not reasonably differ as to its application. *See Grayned v. City of Rockford,* 408 U.S.

**14.** As discussed below, this Court does question whether the ten-foot buffer zone in § 16(B) actually furthers the City's interests in combating harmful secondary effects.

**15.** As a matter of grammar, Section 16(A) should read "to knowingly ... appear ... or

depict" instead of "who knowingly ... appears ... or depicts." Although such sloppy draftsmanship in a criminal law is troubling, the ordinance is only susceptible to one interpretation, and, therefore, cannot be described as unconstitutionally vague.

104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Further, under controlling Supreme Court precedent, the prohibition on appearing in a state of nudity and depicting specified sexual activities passes muster under the fourth prong of the *O'Brien* test. "Pasties and a G-string moderate the expression to some degree, to be sure, but only to a degree. Dropping the final stitch is prohibited, but the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." *Barnes*, 501 U.S. at 587, 111 S.Ct. 2456 (Souter, J., concurring). Similarly, the prohibition on the depiction of sexual activities, which is directly aimed at curbing negative secondary effects, does not burden speech in a way that is substantially broader than necessary.

In addition, J.L. Spoons has failed to show that § 16(A) is substantially overbroad. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (to be unconstitutionally overbroad, a regulation's overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep"). Therefore, the plaintiff is not likely to succeed in its challenge to § 16(A) of the ordinance.

d. *§ 16(B)—Ten-foot distance and two-foot stage requirements* . Section 16(B) makes it a misdemeanor "for a person who knowingly and intentionally … performs in a semi-nude condition unless the person is an employee who while semi-nude, shall be at least ten (10) feet from any patron or customer and on a stage at least two feet from the floor." The ordinance defines "semi-nude" as the exposure of buttocks or the lower portion of the female breast. Thus, a dancer wearing pasties and G-strings is "semi-nude" under the ordinance.

▇▇▇▇ Section § 16(B), like § 16(A), contains incorrect grammar,[16] but

cannot be described as unconstitutionally vague. The law is only fairly susceptible to one interpretation; i.e., that performers in a semi-nude condition must be at least ten (10) feet from any customer and on a stage at least two (2) feet from the floor. *See* Ord. 169–98 § 16(B).

Nonetheless, this Court finds a strong likelihood that the ten-foot buffer requirement of § 16(B) falters on the fourth prong of *O'Brien*. Prohibiting physical contact between semi-nude dancers and patrons is a legitimate way to eradicate the secondary effects of adult-oriented cabarets. Moreover, a buffer zone may be necessary "to ensure that the ban on contact in enforceable." *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403 (6th Cir. 1997), *reh'g denied*. Although the Sixth Circuit has upheld a provision requiring that cabaret performers remain six feet from customers, *id.* at 412–13, this case is distinguishable from *DLS* in at least two important ways.

First, a ten-foot distance requirement is almost twice as long as the regulation upheld in *DLS*. While six feet may reasonably be expected to keep people outside of each other's reach, ten feet goes beyond the length of two arm spans. The City has failed to show how such a long distance requirement furthers the City's interests, and, consequently, the ten-foot buffer zone may not satisfy the second requirement of *O'Brien*. In any event, the ten-foot buffer zone must also be understood in conjunction with the two-foot stage height requirement. Unlike *DLS*, the disputed section in this case requires performers to both remain ten feet from patrons and remain on a stage at least two feet from the floor. Although this Court finds the two-foot stage requirement not to be substantially greater than necessary to achieve the City's goals, this requirement helps render the ten-foot requirement unconstitutional. That is, if performers already must remain on a stage that is two feet high, it is

---

**16.** Also like § 16(A), § 16(B) describes a class of affected persons in the present tense, rath-

er than casting the prohibition in the infinitive.

especially difficult to see how the ten-foot buffer zone is narrowly tailored to the City's interest in preventing crime and disease.

The second distinction between *DLS* and this case is that J.L. Spoons has produced evidence tending to show that the ten-foot buffer zone would destroy the market for adult cabarets.[17] *See DLS*, 107 F.3d at 413 ("if ordinance were intended to destroy the market for adult cabarets, it might run afoul of the First Amendment"). Kevin Morand, an architect, testified that if a ten-foot radius is drawn around the stages in Tiffany's Cabaret, approximately one half of the cabaret's seating would be eliminated. In addition, performers would be effectively prevented from dancing on the smaller mezzanine floor. Although the Court is mindful that there is nothing magic about the current configuration of Tiffany's, this Court must consider the effect of a ten-foot barrier on the entire market. If a ten-foot buffer would substantially impact the seating at a relatively large establishment like Tiffany's Cabaret, then its impact on smaller adult entertainment businesses would be severe.

In sum, J.L. Spoons has demonstrated a substantial likelihood of success on the claim that the ten-foot distance requirement in § 16(B) violates the First Amendment.

e. *§ 16(C)—Limitation on payments and gratuities.* Section 16(C) states that "[i]t shall be a second degree misdemeanor for an employee, while semi-nude ..., to solicit any pay or gratuity from any patron ... or for any patron ... to pay or give any gratuity to any employee, while said employee is semi-nude in a sexually oriented business."

J.L. Spoons argues that § 16(C) is a content-based restriction on pure speech. This Court disagrees. Section 16(C) bans conduct rather than speech; it prohibits the exchange of money or the initiation of a such an exchange. Such a restriction directly targets the City's interest in preventing prostitution. Accordingly, § 16(B) need only satisfy the requirements of *O'Brien*. Because the prohibition on tipping is limited to instances where the performer is in a semi-nude condition,[18] this Court concludes that the restriction is not substantially broader than necessary to achieve the City's goals.

f. *§ 16(D)—Limitation on touching, fondling, and caressing.* Finally, Section 16(D) makes it a misdemeanor "for an employee, while semi-nude, to knowingly touch, fondle or caress a customer." J.L. Spoons argues that this sub-section is overbroad and otherwise violative of the First Amendment. Brunswick argues that when read as a whole, § 16(D) only prohibits intentional contact of a sexual nature.

As discussed previously regarding the distance and stage height requirements, the City may prohibit contact between dancers and patrons without running afoul of *O'Brien*. This Court finds that § 16(D) is narrowly tailored to the City's interest in combating the secondary effects of adult entertainment businesses. The provision contains a scienter element, and, as the City argues, targets contact of an overtly sexual nature. Furthermore, it cannot be said that § 16(D) sweeps in a substantial amount of protected speech. Inadvertent and non-sexual contact is permitted, as is physical contact that occurs

---

17. This Court rejects, however, the plaintiff's argument that tableside dancing is a unique form of expression that is deserving of its own constitutional analysis. Both tableside and stage dancing convey sufficiently similar messages of eroticism for purposes of the First Amendment. J.L. Spoons has nonetheless demonstrated that at least a certain amount of proximity is required for that message to be adequately conveyed.

18. The ordinance does not prevent dancers from soliciting tips while they are wearing something more than pasties and G-strings. In addition, this Court does not find that cases dealing with commercial speech have any meaningful bearing on the constitutionality of § 16(C).

while a dancer is wearing more than pasties and a G-string. Section 16(D) is not unconstitutionally overbroad.

In sum, regarding the four sub-parts of § 16, J.L. Spoons has only shown a substantial likelihood of success on the merits with respect to the ten-foot distance requirement in § 16(B).

### B. Threat of Irreparable Harm to the Plaintiff.

 As explained above, J.L. Spoons is substantially likely to prevail on its claims regarding the licensing scheme (§§ 4–11), the zoning section (§ 12), the provision limiting hours of operation (§ 18), and the ten-foot distance requirement (§ 16(B)). The denial of constitutional rights has been held by numerous federal courts, including the Supreme Court, to constitute irreparable harm. Specifically, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). It follows, as a matter of law, that the plaintiff will suffer irreparable harm if Brunswick is not enjoined from enforcing the above-listed sections.

### C. Threat of Substantial Harm to the Defendant.

This Court does not find that Brunswick· will suffer any appreciable amount of harm if it is enjoined from enforcing the pertinent sections of the ordinance against J.L. Spoons. Therefore, the third factor considered regarding the issuance of a preliminary injunction favors J.L. Spoons.

### D. Whether Injunctive Relief would Serve the Public Interest.

Finally, it is in the public interest to prevent the enforcement of unconstitutional laws, and thereby uphold constitutional rights. The public interest in protecting the freedom of expression in the face of a prior restraint is especially strong considering that such prior restraints are "the most serious and least tolerable infringement of First Amendment rights."

*Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Therefore, the fourth factor in favor of the issuance of a preliminary injunction is also satisfied.

### IV.

For the foregoing reasons, this Court grants J.L. Spoons' motion for a preliminary injunction in part, and enjoins the City from enforcing §§ 4–12, § 16(B), and § 18 of the Ordinance against J.L. Spoons, its officers, agents, and employees.

A status call will be scheduled separately for purposes of determining whether any additional proceedings are necessary to reach a final decision on the merits.

IT IS SO ORDERED.