KENTUCKY RESTAURANT CONCEPTS, INC., d/b/a P.T.'s Showclub, et al., Plaintiff,

and

Taylor Boulevard Theatre, Inc., d/b/a Deja Vu, a Kentucky Corporation, Intervening Plaintiff,

v.

The CITY OF LOUISVILLE, JEFFERSON COUNTY, KENTUCKY, and the Honorable David L. Armstrong, Mayor of the City of Louisville, in his official capacity only, Defendants.

CIVIL ACTION NO. 3:01CV–374–H.

United States District Court,
W.D. Kentucky.
At Louisville,

June 12, 2002.

Agreed Order Amending Decision
July 19, 2002.

Robert D. McClure, Kruger, Schwartz & Morreau, E. Brian Davis, Louisville, KY, Allan S. Rubin, Rubin & Rubin, Southfield, MI, for Kentucky Restaurant Concepts, Inc., Regina Wycott, Michael T. Fischer, Ann F. Hayden, Desiree D. Grider, Tabitha K. Leezer, Karen M. Cocher.

Robert D. McClure, Kruger, Schwartz & Morreau, Allan S. Rubin, Rubin & Rubin, Southfield, MI, for Jane Roe.

Frank Mascagni, III, Louisville, KY, Bradley J. Shafer, Shafer & Associates, Lansing, MI, for Jane Doe I, II and III, Taylor Blvd. Theatre Inc.

Winston E. King, City Law Dept., Louisville, KY, for City of Louisville, Jefferson County, Kentucky, David L. Armstrong.

Paul V. Guagliardo, City Law Dept., Louisville, KY, for Jefferson County, KY.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

This case concerns the City of Louisville's adult entertainment regulatory scheme, LOUISVILLE CODE OF ORDINANCES §§ 111.001–.008 (the "Ordinance"). Plaintiffs, two adult entertainment facilities and several licensed dancers working therein, set out a broad constitutional challenge to virtually every part of the Ordinance as recently amended. The breadth of Plaintiffs' opposition requires the Court to consider the Ordinance in unusual length and detail.

Fortunately, the Court is not working from a blank slate. Both the Supreme Court and the Sixth Circuit Court of Appeals have considered many aspects of the issues raised here. The Court's analysis treads into the well-worn though still rocky constitutional intersection of our inclination to embody private morality as public law, the real concern for the deleterious consequences of allowing some activities to continue or expand unregulated, and reverence of the constitutional right of self-expression.

*Summary*

The Court concludes in Section II of this Memorandum Opinion that the City's substantive regulations of adult entertainment—the well publicized so-called "buffer zone" and related regulations—survive constitutional scrutiny. The less known licensing process, however, presents more difficult constitutional questions. While the Court generally approves of the application requirements, not all pass constitu-

tional muster. As explained in Section III, the City of Louisville must amend or justify its application fees, keep confidential some of applicants' personal information and slightly amend its periodic inspection authority. These are relatively minor requirements. Not so minor is the requirement, described in Section IV of this Opinion, that the City completely revise its application process so as to avoid imposing a prior restraint on First Amendment freedoms. The Court provides some guidance as to how this may be done. Finally, in Section V, the Court concludes that this last impediment to constitutional freedoms is significant enough that the Court must enjoin enforcement of the entire Ordinance until it is properly amended.

### I.

The City of Louisville has regulated and litigated with sexually-oriented adult entertainment businesses for the past quarter-century.[1] During this period, City laws have regulated licensing and zoning, as well as time and manner of operation. Within the last year, the City has enacted its most specific regulation yet concerning the operation of adult entertainment facilities.

The Ordinance regulates only establishments providing adult entertainment in which the entertainers expose their breasts or genitals. A bar, restaurant or other entertainment establishment need not obtain any license under the Ordinance so long as its entertainers do not expose their breasts or genitals and so long as the establishment does not feature other adult entertainment described in the Ordinance.[2]

The following is a general overview of the Ordinance.[3] Section 111.001 makes findings concerning the potential adverse effects of unregulated adult entertainment activities and states that the Ordinance's purpose is to control those secondary effects. Section 111.002 defines adult entertainment establishments and activities. Among those particularly relevant to our case are the "adult cabaret" and "cabaret." An adult cabaret may feature entertainers who dance fully nude, but must obtain an adult cabaret license, and may not serve alcoholic beverages. The Ordinance separately defines a "cabaret" as a nightclub, bar, restaurant, or other commercial establishment which features topless entertainment rather than total nudity. One who engages in the cabaret business must apply for a cabaret license. A cabaret may serve alcoholic beverages.

Section 111.004 outlines the steps necessary to obtain an adult cabaret or cabaret license. First, an applicant must provide a significant amount of information about the business and its owners and directors, including their names, addresses, social security numbers and photographs. Applicants must also obtain statements from myriad City agencies to demonstrate com-

---

1. The first ordinance regulating adult entertainment activities was enacted in 1977. Since that time, the ordinance has been subject to periodic litigation. U.S. District Court Judges Thomas Ballantine and Charles Allen declined to enjoin the original ordinance, finding it constitutional. In 1986, Judge Allen did enjoin certain parts of the ordinance, and the City's Board of Aldermen specifically amended those parts of the ordinance. More recently, in 2001, Jefferson Circuit Court Judge James Shake found parts of the ordinance, as amended in 1998, to be procedurally defective. In response, the Aldermen en-

acted the latest amendments to correct those deficiencies, and, simultaneously, added the "buffer zone" provisions described in Section II, *infra*.

2. Of course, all facilities, employees and performers are subject to other applicable state and local laws, such as Alcoholic Beverage Control laws, laws against lewd behavior and laws prohibiting prostitution.

3. Specific Ordinance provisions are addressed in greater detail as the Court considers Plaintiffs' challenges separately.

pliance with various health and safety regulations. Once the requisite information, materials and payment—$5,000 for an adult cabaret license, $3,000 for a cabaret license—have been submitted, the City Department of Inspections, Permits and Licenses (the "Department") must perform an inspection. If all the necessary conditions are satisfied, and the applicant has not been convicted within the past five years of certain criminal offenses, the Director must issue the license within ten days. If the inspection is not completed within thirty days after the receipt of the application, the Department must issue a temporary license that will be effective for thirty days or until the inspection is completed, whichever comes first.

The application process for individual entertainers is similar to that for establishments, although not identical. Each applicant must submit her legal and stage names, resident address, date of birth, social security number, a recent photograph, and fingerprints. Once a completed application and $100 fee have been submitted, the Director shall grant the license within ten days after receiving a report from the City police that the applicant has not been convicted within the past five years of certain criminal offenses. If the Director does not receive this police report within fifteen days of the receipt of the application, a temporary license shall issue, effective for fifteen days or until the report is received, whichever comes first. These requirements are the same for both adult cabaret and cabaret entertainers.

Section 111.003 sets forth restrictions upon operation. Until recently, the Ordinance regulated only the location, physical design and appearance of adult cabarets and cabarets. The Ordinance regulated the attire of the entertainers as a way of defining the type of facility as either an adult cabaret or cabaret. However, the Ordinance did not specifically regulate the conduct of the entertainers or the manner of their performance. In October 2001, the City amended the Ordinance to impose restrictions on their conduct. Generally, the amendment prohibits physical contact between an entertainer and other persons during any performance, requires all performances to occur on a stage at least eighteen inches above the immediate floor level, and requires all entertainers to remain at least three feet removed from all other persons during a performance. The Ordinance also provides that any violation by an entertainer shall be considered an act of the owner or operator of the premises for purposes of determining whether a license should be revoked, suspended or renewed.

Section 111.005 states the procedures for license renewals, suspensions or revocations. It provides that in the event the Director refuses to renew, suspends or revokes a license, and the applicant appeals the decision, the license shall remain in full force and effect during the pendency of the appeal. Finally, § 111.008 that any violation shall be a misdemeanor punishable by a fine of up to $100 or imprisonment not to exceed fifty days, or both.

## II.

■ The First Amendment of the United States Constitution protects nude or nearly nude dancing which expresses eroticism and carries an endorsement of erotic experience. See *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 581, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion) (Souter, J., concurring in the judgment).[4]

---

4. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quotation

Plaintiffs aim to communicate precisely such a message of fantasy, intimacy and sexuality. According to their testimony, they accomplish this by creating a carefully choreographed sexual atmosphere within the adult facilities. While this may not be everyone's idea of entertainment, Plaintiffs' activities unquestionably are entitled to constitutional protection. Nevertheless, it is clear that, within certain parameters, a municipality may regulate such expressive conduct. *See generally id.* The so-called "buffer zone" and related provisions directly regulate expressive conduct. The initial question this Court must decide is what level of constitutional scrutiny applies to these restrictions.

In a preamble to its recent amendment of the Ordinance,[5] the City states its intent to control or limit the adverse secondary effects of adult entertainment activity, and cites several studies conducted in other urban centers which link such activity to crime and neighborhood deterioration. The Supreme Court has said that courts should generally accept the expressed purpose of a legislative body, rather than second-guess it. *See id.* at 582, 111 S.Ct. 2456 ("Th[e] asserted justification for the statute may not be ignored merely because it is unclear to what extent this purpose motivated the ... Legislature in enacting the statute. Our appropriate focus is not an empirical enquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional.") (Souter, J., concurring in the judgment) (citation omitted). Here, the City has clearly expressed its intent

and its interest in a manner similar to that in other ordinances which the Sixth Circuit has approved. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County,* 274 F.3d 377 (6th Cir.2001); *DLS, Inc. v. City of Chattanooga,* 107 F.3d 403 (6th Cir.1997). In these cases, the Sixth Circuit accepted those cities' stated purpose to control the believed secondary effects of adult entertainment establishments. Under our circumstances and record, the Court should respect the City of Louisville's similarly stated interest.

In *Deja Vu* and *DLS,* the Sixth Circuit concluded that similar regulations with the same underlying justifications should be analyzed under the test conceived in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), for content-neutral restrictions on expressive conduct. *See Deja Vu* at 391; *DLS* at 410. In *O'Brien,* the Supreme Court set out a four-prong test for evaluating such content-neutral regulations:

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. 1673. All four are closely related under circumstances such as these, and courts have tended to consider all four prongs almost as one. The Court will consider each separately.

marks, citation omitted). In *Barnes,* Justice Souter concurred in the judgment on the narrowest grounds, and accordingly, his concurring opinion will bind this Court.

**5.** This preambulary statement of purpose appears as an introduction and explanation for

the amendments passed in the fall of 2001. It does not appear in the text of the revised Ordinance, but it does appear in the record of this case. Section 111.001 of the Ordinance makes findings of fact which act as a justification for the entire Ordinance, as amended.

## A.

The first three *O'Brien* prongs do not require groundbreaking analysis. The Sixth Circuit has already considered and rejected arguments similar to those of Plaintiffs. The City clearly has the constitutional power to enact the buffer zone regulations, for where a state or local government perceives that adult entertainment establishments "contribute to the blighting or downgrading of the surrounding neighborhood ... [t]he purpose of preventing the deterioration of commercial neighborhoods [is] certainly within the concept of the public welfare that defines the limits of the police power." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 74–75, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) (Powell, J., concurring in the judgment) (quotation marks, citation omitted). Moreover, none would dispute that preventing crime, limiting risks to health and safety and averting the deterioration of neighborhoods are important municipal interests.

Plaintiffs argue that adult entertainment establishments do not produce these secondary effects, and that, consequently, restrictions on free expression cannot be justified based on a supposed intent to limit them. Plaintiffs hope to show that the City's true purpose is to unlawfully suppress expression. To show this, Plaintiffs attempt to discredit the City's evidentiary justification in several ways. First, Plaintiffs argue that the studies on which the City relies are unreliable and nonprobative. The City's Board of Aldermen relied on studies of secondary effects arising from adult entertainment establishments in various cities, including Newport News, Virginia; Garden Grove and Los Angeles, California; Indianapolis, Indiana; Minneapolis, Minnesota; and Austin, Dallas, and Houston, Texas. These studies show a correlation between adult entertainment establishments and crime, particularly sexual offenses, and resemble the study conducted and relied upon by the City of Chattanooga in *DLS*.[6] Even though Chattanooga relied upon its own investigation, a city-specific study is not required. The Supreme Court has made absolutely clear that a city, in devising regulations to limit or prevent secondary effects of adult entertainment, may rely upon studies from other cities, or even upon the evidentiary foundation established in other judicial opinions "to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood." *City of Erie v. Pap's A. M.*, 529 U.S. 277, 297, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion); *accord Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

Next, Plaintiffs submit a Charlotte, North Carolina study which suggests that the presence of adult entertainment establishments in a neighborhood does not increase crime or lower property values, and, counterintuitively, may have the opposite effect, actually benefitting communities. However, the City's elected representatives are entitled to rely upon the

---

**6.** A city need not rely on proof of causation; proof of mere correlation suffices to justify regulation aimed at reducing secondary effects:

> To say that pernicious secondary effects are associated with nude dancing establishments is not necessarily to say that such effects result from the persuasive effect of the expression inherent in nude dancing. It is to say, rather, only that the effects are correlated with the existence of establishments offering such dancing, without deciding what the precise causes of the correlation actually are.... Because the State's interest in [regulation] results from a simple correlation of such dancing with other evils ... the interest is unrelated to the suppression of free expression.

*Barnes,* 501 U.S. at 585–86, 111 S.Ct. 2456 (Souter, J., concurring in the judgment).

studies of their choice and to experiment with their own regulation of the secondary effects of adult entertainment. *See City of Los Angeles v. Alameda Books, Inc.,* —— U.S. ——, ——–——, 122 S.Ct. 1728, 1742–43, 152 L.Ed.2d 670 (2002) (plurality opinion) (Kennedy, J., concurring in the judgment).

Plaintiffs also offer their own compilation of data suggesting that police service calls are placed less often from their establishments than from certain other Louisville-area establishments which do not feature adult entertainment. Even if true, this does not disprove that the enactment of buffer zone regulations may reduce criminal activity and further an important governmental interest. In essence, Plaintiffs argue that the City did not regulate broadly enough. The Sixth Circuit in *DLS* dismissed a similar claim of "underbreadth." 107 F.3d at 411–12.

Finally, Plaintiffs directly attack the idea that these regulations address a public health concern. While reasonable minds may differ on the public health issue, in *DLS* the Sixth Circuit recognized that contact between a patron and an entertainer—even in the context of a purportedly harmless "lap dance"—may pose enough of a health risk to justify regulation. *See id.* at 410. Under *Pap's A.M.* and *Renton,* the City is entitled to recognize and rely upon this holding of *DLS.* In any event, considering the other secondary effects addressed, a scientific resolution of the health issue is not absolutely necessary.

Whether the Ordinance will help achieve the City's stated objectives is difficult to say with certainty. Under *O'Brien,* however, the Ordinance need only further—not fully achieve—the City's stated important interest. *See Pap's A.M.,* 529 U.S. at 300, 120 S.Ct. 1382 ("requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects, but

*O'Brien* requires only that the regulation further the interest in combating such effects."). As the Sixth Circuit found in both *Deja Vu* and *DLS,* a proscription upon contact, a "buffer zone," and an eighteen-inch stage requirement do further this interest in combating secondary effects. Consequently, the City has met the first three prongs of the *O'Brien* test.

### B.

The last prong of the *O'Brien* test asks whether the buffer zone restrictions on expression are no greater than necessary to further the asserted governmental interest. Naturally, the meaning of this prong has itself generated some controversy. However, the Supreme Court has clarified that the government's regulation "need not be the least restrictive or least intrusive means of doing so," and that it is valid "so long as the means chosen are not substantially broader than necessary to achieve the government's interest ..." *Ward v. Rock Against Racism,* 491 U.S. 781, 798–800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quotation marks, citations omitted); *see also DLS,* 107 F.3d at 412–13 (applying *Ward* ).

The Sixth Circuit has already considered and rejected many of Plaintiffs' arguments, and in the process has approved ordinances remarkably similar to that at issue here. In *DLS,* the Sixth Circuit upheld an ordinance provision which prohibited entertainers in adult entertainment establishments from coming within six feet of patrons, employees or other entertainers. In pertinent part, the Chattanooga ordinance read as follows:

No entertainer, employee or customer shall be permitted to have any physical contact with any other on the premises during any performance and all performances shall occur only upon a stage at least eighteen inches (18″) above the im-

mediate floor level and removed at least six feet (6′) from the nearest entertainer, employee and/or customer.

*Id.* at 406. Based on the record before it, the *DLS* panel concluded that "the addition of a buffer zone to the ban on contact was necessary to achieve that goal [of limiting the spread of disease], given the repeated violations of the [preexisting] no-contact rule and testimony to the effect that, without a buffer zone, it was difficult to determine if contact actually occurred or who was responsible." *Id.* at 411. Further, *DLS* dismissed arguments that the ordinance was broader than necessary because it might necessitate partial renovation of the premises and lessen the number of tips entertainers would receive. *See id.* at 413.

In *Deja Vu*, the Sixth Circuit upheld a Nashville ordinance which stated that:

> No customer shall be permitted to have any physical contact with any entertainer on the licensed premises while the entertainer is engaged in a performance of live sexually oriented entertainment. All performances of live sexually oriented entertainment shall only occur upon a stage at least eighteen inches above the immediate floor level and removed at least three feet from the nearest customer.

*Id.* at 396. The *Deja Vu* panel encountered, and dismissed, many of the same arguments made in *DLS. See* 274 F.3d at 396–97.

For all practical purposes, the substantive provisions of Louisville's Ordinance are identical to those in *DLS* and *Deja Vu.* The Ordinance, in pertinent part, reads as follows:

> No entertainer, dancer, employee or patron of a cabaret or adult entertainment establishment shall be permitted to have any ph[y]sical contact with any other entertainer, dancer, employee or patron on the premises during any performance

and all performances shall only occur upon a stage at least 18 inches above the immediate floor level and removed at least 3 feet from the nearest entertainer, dancer, employee and/or patron.

*Id.* at § 111.003(L)(1). The rationale stated in both *DLS* and *Deja Vu* requires approval of the substantive provisions at issue here. Nevertheless, Plaintiffs' arguments deserve comment.

Plaintiffs say that the three-foot distance between entertainer and patron prevents the entertainers from conveying fully the intended message of intimacy and sexuality. However, the Court finds this a difference in degree, not a difference in kind. The Ordinance leaves performers with many options for communicating an erotic or intimate message. A nude or nearly nude dancer performing within three feet of a patron has plenty of leeway to communicate both eroticism and intimacy. The expression of eroticism is not significantly diminished because a performer cannot literally be in a patron's face; nor is the expression of intimacy foreclosed by a three-foot distance, even in light of the loud music Plaintiffs feature. *See Deja Vu*, 274 F.3d at 397 ("[I]f customers and entertainers cannot converse while standing a mere three feet apart, it is because the plaintiffs have chosen to play their music at such a volume that conversation is impossible. Contrary to the plaintiffs' claims, the Ordinance does not force entertainers to choose between verbal communication and no music; as Metropolitan Nashville suggests, the plaintiffs can simply turn their music down a bit.")

Plaintiffs argue further that the Ordinance will inflict financial harm upon all who attempt to operate adult cabarets or cabarets as regulated. While they make a broader and more comprehensive challenge than that rejected in *DLS*, Plaintiffs fall well short of showing that the Ordi-

nance denies them a "reasonable opportunity" to operate profitably an adult entertainment establishment generally. *See Renton*, 475 U.S. at 54, 106 S.Ct. 925; *DLS*, 107 F.3d at 413. The Court assumes that the regulated establishments will see a drop in revenues, perhaps even a sharp one. However, the Constitution does not protect Plaintiffs' right to profitably operate a particular type of adult entertainment establishment. In our case, the Ordinance regulates only a portion of establishments that reasonable persons might classify as providing adult entertainment or erotic dancing. The regulated establishments need only place pasties and G-strings on dancers to avert the requirements of the Ordinance, which applies only to establishments featuring topless or fully nude dancing. Such a change would be only a *de minimis* limitation on the expression. *See Barnes*, 501 U.S. at 587, 111 S.Ct. 2456 ("Pasties and a G-string moderate the expression to some degree, to be sure, but only to a degree.... [T]he limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message.") (Souter, J., concurring in the judgment). If, as the Supreme Court has held in *Barnes* and *Pap's A. M.*, a municipality can prohibit nudity altogether, without apparent concern for the economic consequences to a particular type of entertainment, then a less restrictive regulation should also be permissible.

Municipalities have broad authority to enact wise and unwise laws, so long as those laws do not offend the Constitution. The Court need not enter a debate about either the wisdom or the effectiveness of the Ordinance. However, the Court does conclude that the buffer zone provisions further the asserted governmental interest and go no further than the range of activities reasonably necessary to do so.

## C.

■ Finally, Plaintiffs argue that the Ordinance's substantive provisions should be voided because they are vague and overbroad. For obvious reasons, this argument has constitutional implications. If a law is so vague that a person of ordinary intelligence cannot reasonably interpret what is prohibited, it should be voided. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). A law is overbroad "if in its reach it prohibits constitutionally protected conduct." *Id.* at 114, 92 S.Ct. 2294 (citation omitted). Where a law has few objective criteria for measurement, or has very broad language, public officials could enforce it arbitrarily, and chill protected expression. *See id.* at 108–09, 92 S.Ct. 2294. These two doctrines are interrelated here.

Plaintiffs contend that both the three-foot measurement and term "performance" are impermissibly vague. They say that a person of ordinary intelligence would not know whether three feet should be measured toe-to-toe, torso-to-torso, fingertip-to-fingertip, or otherwise. The term "performance" is too vague, they contend, because the dancers "perform" not merely by dancing, but also by conversing with patrons. Further, Plaintiffs argue that the Ordinance is overbroad because the phrase "during any performance" permits the City to cite persons inside the establishment for touching or being within three feet of *anyone* else at any time, even outside the context of a performance, because performances take place continuously.

William Schreck, the Department's Director, testified at a hearing about the intended enforcement of the buffer-zone provision. He stated that all performances must take place on one or more stages, and that the Ordinance's provisions will be satisfied if either: 1) the edge of any stage where performances occur is at

least three feet from the area where patrons. are seated, or 2) patrons are seated against the stage but a line is drawn three feet from its edge, beyond which entertainers are permitted to dance. Entertainers and patrons would be free to stick their arms or legs "over the line" in either case, but not to step outside it. The Department, Schreck testified, interprets the word "performance" as dancing or other physical movement for which entertainers are to be paid, and the phrase "during any performance" as relating only to an entertainer who is performing and to any entertainer, dancer, employee or patron within three feet as determined in the manner stated above.

Schreck's testimony draws clear lines to inform interested parties what is considered a violation of the Ordinance. It establishes a sufficiently specific standard to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108, 92 S.Ct. 2294. Moreover, these standards provide law enforcement authorities the guidance necessary to prevent arbitrary and discriminatory enforcement, and are not so uncertain as to chill activity protected by the First Amendment by "lead[ing] citizens to steer far wider of the unlawful zone" than necessary. *Id.* at 109, 92 S.Ct. 2294 (quotation marks, citations omitted). Therefore, the Ordinance is not unconstitutionally vague.

■ As to overbreadth, "[i]t has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (citation omitted). To be sure, the Department could read the plain language of this Ordinance as applying to incidental and general social touching in a way impermissible under First Amendment jurisprudence. However, to do so would require an interpretation entirely inconsistent with the obvious purpose of the Ordinance, which is to limit touching between entertainers and others during any erotic dance performance. Given both the evident legislative intent and the actual text, the Department's interpretation is a reasonable one, and the Court should not contort the Ordinance "to conjure up a hypothetical constitutional clash where none actually exists." *Eubanks v. Stengel*, 28 F.Supp.2d 1024, 1036 (W.D.Ky. 1998) (citation omitted).

A court's duty is to give effect to the manifest intention of the enacting legislature. "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. In such cases, the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enters.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quotation marks, citations omitted). If the City should ever enforce the Ordinance in a way that infringes upon constitutional rights, Plaintiffs and others would have cause for an as-applied challenge. However, Plaintiffs have failed to show that this provision of the Ordinance facially violates the Constitution.

The buffer zone provisions of this Ordinance are no more vague or overbroad than those enacted in Chattanooga and Nashville which the Sixth Circuit has already considered and approved. Plaintiffs have not offered any persuasive argument or evidence that convinces the Court to distinguish our circumstances from those two holdings. Facially, these buffer zone provisions do not violate the First Amendment.

### III.

Plaintiffs' second major challenge targets multiple Ordinance provisions on a variety of grounds. Some of Plaintiffs' arguments necessitate extended discussion—such as those involving disclosure requirements, disabling offenses, and licensing fees—while others are less complex—such as those involving strict liability, periodic inspections, and double jeopardy. The Court will address each in turn.

### A.

Plaintiffs argue that to require applicants to provide voluminous and unnecessary information acts as a prior restraint, chilling Plaintiffs' exercise of their First Amendment rights. The Ordinance does have numerous disclosure requirements. Each business owner, operator, director, officer, manager, property owner, and rental agent must disclose his or her name, address, date of birth, social security number, photograph, and criminal history. *See* § 111.004(A), (K)(2). Each entertainer must disclose her legal name, stage name, resident address, date of birth, social security number, a recent photograph, and fingerprints. *See* § 111.004(J)(1), (K)(10)(a).

The Sixth Circuit has recognized that municipalities have "a legitimate interest in identifying those who are legally accountable for the operation of a sexually oriented business ...." *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 226 (6th Cir.1995). The Ordinance's disclosure requirements appear intended to collect data sufficient to identify the employers and employees of sexually oriented businesses. *See* § 111.001(C). This purpose is "unrelated to the suppression of expression," and the Court must therefore apply the *O'Brien* test to determine the disclosure provisions' constitutionality. *See Deja Vu*, 274 F.3d at 391; *East Brooks Books*, 48 F.3d at 226.

Like the Sixth Circuit in *Deja Vu*, this Court has little difficulty finding that such disclosure requirements meet the first three prongs of the *O'Brien* test. Of course the City may identify those individuals who either operate or are employed by sexually oriented businesses. Here, the class of persons who must provide information is appropriately limited and the information required is reasonable. For example, § 111.004(A)(2), (3) apply only to the names and addresses of the directors, officers and plurality shareholder of a corporation, not to all shareholders. These persons have a direct legal responsibility for the business operations.[7] Similarly, requiring entertainers to provide some identifying information merely facilitates enforcement of the Ordinance.

Whether the disclosure provisions survive the fourth prong of *O'Brien* is a closer question. Perhaps not all of the required information is absolutely essential. However, no particular disclosure is either unreasonable or inappropriate. Plaintiffs do not make a persuasive argument that mandating all these disclosures is unreasonable, and they cite no case law in support of their position. The Sixth Circuit has made clear that "states are not required to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently

---

7. The Sixth Circuit in *East Brooks Books* invalidated a "requirement that every person with *any ownership* interest, no matter how small, sign the application" as impermissibly broad. 48 F.3d at 226 (emphasis added). However, the court also noted: "We agree that the City has a legitimate interest in identifying those who are legally accountable for the *operation* of a sexually oriented business ...." *Id.* (emphasis added).

based could not reasonably be conceived to be true by the governmental decision maker." *Deja Vu*, 274 F.3d at 393–94 (quotation marks, citation omitted). Plaintiffs have not made such a showing and, therefore, the Court must conclude · that the disclosure requirements do not act as an unconstitutional prior restraint.

1.

■ Plaintiffs also argue that the entire licensing scheme should be enjoined because it makes too much personal information readily obtainable by the general public. Indeed, the general public may have access to much of the application disclosures under the Kentucky Open Records Act, K.R.S. §§ 61.870–.884. At the hearing, Plaintiffs showed that the City has made personal information available to the public at large. The City's release of this material raises the possibility that "the provisions will pose more than an incidental burden on First Amendment activities because those wishing to engage in such activities will be chilled by the threat of public exposure and possible violence." *Deja Vu*, 274 F.3d at 394 (citation omitted).

*Deja Vu* analyzed a similar challenge to Nashville's licensing scheme in the context of Tennessee's Open Records Act, and applied the reasoning of a prior Sixth Circuit decision, *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir.1998), which had held that the release of certain municipal police personnel information was constitutionally prohibited. *See* 274 F.3d at 394–95. Accordingly, *Deja Vu* held that "all sexually oriented business license and permit applicants' names and current and past residential addresses constitute[d] protected private information and [we]re therefore exempted from Tennessee's Open Records Act." *Id.* at 395. A city "cannot publicly release such information; it can, however, require applicants to provide the identifying information to the licensing board for the limited purpose of ensuring

compliance with the Ordinance's regulations, provided [the city] keeps that information under seal." *Id.* The issue, then, is not whether the City can require applicants to submit personal information. It may do so. Rather, the issue is whether Kentucky's Open Records Act permits disclosure of the information to the general public.

K.R.S. § 61.878(1)(a) exempts from disclosure "[p]ublic records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy[.]" Kentucky courts determine whether requested information is exempt by examining, first, if the information is of a personal nature. *See Zink v. Kentucky Dep't of Workers' Claims*, 902 S.W.2d 825, 828 (Ky.Ct.App.1994) (citing *Kentucky Bd. of Examiners of Psychologists v. Courier–Journal & Louisville Times Co.*, 826 S.W.2d 324 (Ky.1992)). Information such as an applicant's name, address, date, of birth, social security number, photograph, criminal history, and fingerprints is personal in nature. Next, the court must balance the individual's privacy interest in nondisclosure against the public's interest in openness. *See id.* To do so, the Court must consider the separate privacy expectations of both entertainers and operators.

Entertainers market a product. They attempt to create an erotic fantasy for their customers. Unfortunately, some patrons seek to make the fantasy a reality. While at work, access to the entertainers is controlled, and their safety reasonably ensured. When not at work, however, some admiring patrons may initiate contact which can range from mildly annoying to physically threatening. Balancing the entertainers' privacy interests in nondisclosure against the public good served by making such information available is fairly simple. The former is great. The latter is

minimal because the public at large has little need for personal information about dancers. Accordingly, the Court finds that none of the information submitted by entertainer license applicants may be publicly disclosed.

Persons who own and operate businesses for profit, on the other hand, do invite some public scrutiny, and necessarily forfeit some amount of privacy. However, *Deja Vu* noted that the risks of harassment outside the workplace "also apply to individual business associates, such as registered agents, officers, directors, certain shareholders, club managers, and assistant managers," and held that some items of their personal information were exempt from disclosure under Tennessee's Open Records Act. 274 F.3d at 395. As a practical matter, such risks are probably much less for owners than for entertainers. Nevertheless, the Court agrees with *Deja Vu* and exempts from disclosure that information which is distinctly unrelated to their business enterprise, including an applicant's residential address and phone number, date of birth, social security number, photograph, and criminal history. The City may require the submission of this material, but may not release it to the public.

With these restrictions on public dissemination in place, the Court holds that the Ordinance's disclosure provisions pose only an incidental burden on First Amendment freedoms. The burden is not substantially greater than necessary to further the City's legitimate interests and, therefore, these provisions pass the fourth prong of the *O'Brien* test.

2.

■ In addition to challenging the Ordinance disclosure provisions generally, Plaintiffs also contend that the specific requirement that they submit social security numbers to the City as part of their license application is a violation of the Privacy Act of 1974, Pub.L. No. 93–579, § 7(a)(1), 88 Stat. 1896, 1909 (1974), which provides that "[i]t shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number."

The Ordinance does require numerous persons to submit their social security numbers in the application process. *See* § 111.004(A)(2), (5), (6), (7) (adult cabaret establishment); (J)(1) (adult cabaret entertainer); (K)(2)(b), (e) (cabaret establishment); and (K)(10)(a) (cabaret entertainer). In practice, the City will not initiate the final step in the license approval process until it receives an application that includes all mandatory information. *See* § 111.004(C), (K)(4). The Ordinance does not specifically state the consequence of submitting an incomplete application, but the Court must assume that the City would not issue a license.

This appears to be an issue of first impression. Neither party provided, nor could the Court find, a single federal case discussing the Privacy Act's effect upon a municipal requirement that one must submit his or her social security number as part of an adult entertainment application process, a common feature of most licensing schemes.[8] Some courts have consid-

---

**8.** Indeed, it would seem rather commonplace for the government to require individuals to submit their social security numbers as part of a regulatory process. Of course, it may be that most persons either have no objection to disclosing this information, or they are simply unaware of their rights under the Privacy Act. Section 7 of the Privacy Act contains two significant exemptions. Its restrictions do not apply to: 1) disclosure required by federal statute, or 2) disclosure to any federal, state, or local agency maintaining a system of records in existence and operating prior to January 1, 1975. *See* § 7(a)(2). Many Privacy Act challenges are waged in the context of voting registration requirements, and turn on the

ered the requirement as a "time, place and manner" restriction without reference to the Privacy Act. Those courts disagree whether an individual's social security number is an indispensable piece of information that must be submitted when seeking a license to operate a sexually oriented business.[9] This Court believes that a municipality may request that applicants submit their social security numbers as part of their license application. However, that does not answer the Privacy Act question.

The City has not suggested that the Ordinance meets any of the exceptions to enforcement of the Privacy Act. Accordingly, the Court concludes that it should give effect to the clear terms of that stat-

---

ute. In other words, while the City may ask for an applicant's social security number, it may not deny a license because the applicant refuses to disclose this information.

### B.

The Ordinance contains a number of "criminal disability" provisions, so-called because an applicant is disqualified from receiving a license if he or she has been convicted of any one of a number of criminal offenses—*e.g.*, gambling, sexual, or narcotics offenses—within the past five years.[10]

The Sixth Circuit has considered similar provisions, albeit fairly briefly, and found

---

"grandfather" exception to the Act. *See, e.g., McKay v. Thompson,* 226 F.3d 752, 755 (6th Cir.2000) (finding no Privacy Act violation because Tennessee statute requiring social security numbers for voter registration purposes was enacted in 1972); *McKay v. Altobello,* 1997 WL 266717, at *2–*3 (E.D.La. May 16, 1997) (holding that commissioner of elections cannot require voters to disclose their social security numbers as a prerequisite to registering to vote because Louisiana presented inadequate evidence that its voter registration system was operating prior to 1975). In this case, the City has offered no argument that the Ordinance qualifies for the "grandfather" exemption to the Privacy Act.

**9.** *Compare Brownell v. City of Rochester,* 190 F.Supp.2d 472, 506 (W.D.N.Y.2001) ("Social Security numbers are one of the most commonly used means of verifying persons' identities today, and I also uphold that requirement."), *with Schultz v. City of Cumberland,* 228 F.3d 831, 852 (7th Cir.2000) ("we invalidate the required production of a ... Social Security number" because the information is "redundant and unnecessary" for the city's stated purposes).

**10.** More specifically, § 111.004(C) states:

no license [for an adult cabaret] will be issued if the applicant or any owner, operator, director, partner, shareholder, or employee has been convicted of any offense set forth in KRS 528.010 (gambling), KRS

529.010 (prostitution), KRS 506.030 (if such solicitation pertains to an offense of solicitation of prostitution under KRS 529), KRS 510.150 (sexual offense), KRS 531.010–531.040 (distribution of obscene material to a minor and use of a minor to produce, promote, or distribute obscene material), and/or KRS Chapter 218 (controlled substances) within the last five years.

Subsection 111.004(K)(4) states:

no license [for a cabaret] will be issued if the applicant or any owner, operator, director, partner, shareholder, or employee has been convicted of any offense set forth in KRS [Chapter] 529 (prostitution), KRS 506.030 (if such solicitation pertains to an offense of solicitation of prostitution under KRS Ch. 529), KRS 510.150 (sexual offense), KRS 531.010 through 531.040 (distribution of obscene material to a minor and use of a minor to produce, promote, or distribute obscene material), and/or KRS Chapter 218 (controlled substances) within the last five years.

Finally, § 111.004(J)(2) and (K)(10)(b) state that the Director shall grant a license to be an adult cabaret dancer or cabaret dancer, respectively:

after receiving a report from the City Division of Police that the applicant has not been convicted in the past five years of an offense set forth in KRS 529.010–KRS 529.080 (prostitution), pandering, or under KRS 510.010–510.150 (sexual offenses) or of trafficking in a controlled substance.

them constitutional in two instances. In *DLS*, the Chattanooga ordinance required a license applicant to "not have been convicted of or pleaded nolo contend[e]re to a 'felony or any crime involving moral turpitude, prostitution, obscenity, or other crime of a sexual nature,' within the past five years." 107 F.3d at 414. The Sixth Circuit concluded that "the ordinance survives the First Amendment challenge; it does not allow City officials to exercise discretion by passing judgment on the content of the protected speech, and it sufficiently limits the discretion of the decisionmaker." *Id.* (quotation marks, citations omitted). The court noted that the "moral turpitude" criterion "carries with it the potential for ambiguity, [but] it is a defined term of art in Tennessee," having been narrowed by the state supreme court to the definition found in Fed.R.Evid. 609 of "crimes on which a witness is subject to impeachment, i.e., a crime punishable by death or more than one year of imprisonment, or a crime involving dishonesty." 107 F.3d at 414–15.

In *Deja Vu*, the court applied the *O'Brien* test to "determine whether the Ordinance's civil disabilities provisions constitute[d] merely an incidental burden on the plaintiffs' First Amendment rights that [was] essential to furthering Metropolitan Nashville's stated interest in battling the secondary effects of the sex industry." 274 F.3d at 392. The court found that:

> [t]he Ordinance's civil disabilities provisions serve to weed out those applicants most likely to engage in the type of criminal behavior that the Ordinance seeks to redress by temporarily disqualifying those who have recently committed such acts from working for sexually oriented establishments, or alternatively, from declaring any sexually oriented establishment closely associated with such an individual ineligible to operate. In light of the temporary nature of the ban and the narrow reach of the provisions

(applying only to those who have committed a felony sex crime within the last five years or a misdemeanor sex crime within the last two years), we do not find that these provisions violate the Constitution.

*Id.* The Sixth Circuit emphasized that its ruling on this issue was not controlled by the court's prior decision in *City of Paducah v. Investment Entm't, Inc.*, 791 F.2d 463 (6th Cir.1986), in which the court invalidated a licensing scheme that mandated revocation of a business's license or permit if its employees had distributed or exhibited obscene material. The *City of Paducah* court held that the purpose of the revocation provisions was "to control future expression by businesses that have been subjected to the nuisance abatement procedure." 791 F.2d at 470. In *Deja Vu,* however, the Sixth Circuit found that:

> the Ordinance's civil disabilities provisions exist to combat the sex crimes connected with sexually oriented establishments by temporarily prohibiting those recently convicted of such crimes from employment with those establishments. Because both the Ordinance and the civil disabilities provisions are unrelated to speech, we are faced with a different issue than that decided in *City of Paducah.*

274 F.3d at 392.

■ This Court notes that in *DLS* and *Deja Vu,* the Sixth Circuit upheld the licensing schemes, but did not define the outer boundaries of disabilities provisions, or even announce a standard under which to analyze them (beyond *Deja Vu's* cursory reference to *O'Brien* ). Nevertheless, read together, *DLS* and *Deja Vu* suggest that three factors are relevant when examining a disabilities provision: first, the duration of the disabled period (*i.e.*, the amount of time a prior conviction will prevent an applicant from receiving a license); sec-

ond, the nature of the underlying disabling offense; and third, the relationship between the disabling offense and the secondary effects the Ordinance is designed to combat. The Court will therefore examine these factors.

1.

■ *Deja Vu* stated that the "temporary" length of the disabling period—five years from the date of conviction for felon sex offenders, two years for misdemeanant sex offenders—was critical to the provision's constitutionality. *See id.* at 392. Louisville's Ordinance similarly imposes a five-year ban, but does not distinguish between felony and misdemeanor offenses. Instead, the Ordinance cites to specific provisions of Kentucky law, many of which proscribe acts that may be classified as either a felony or misdemeanor, depending on the circumstances of the violation. For example, § 111.004(C), (J)(2), (K)(4), and (K)(10)(b) each state that a conviction within the last five years for prostitution will prevent an applicant from receiving a license, and cite generally to K.R.S. §§ 529.010–.080. Section 529.020(2) provides that engaging in prostitution is a misdemeanor, while § 529.030 provides that promoting prostitution is a felony.

The Court does not believe that the distinction between five years for felonies and two years for misdemeanors was pivotal in *Deja Vu*. First, the Sixth Circuit made repeated references to the temporary duration of the disabling period. Five years seems to be a reasonably temporary period for constitutional purposes. Second, if the five-year/two-year distinction had constitutional significance, the Sixth Circuit would have explicitly stated as much. Third, *Deja Vu* in no way attempted to distinguish itself from *DLS*, which upheld a broader five-year ban for a conviction or nolo contendere plea for "a felony *or any crime* involving moral turpitude, prostitution, obscenity, or other crime of a sexual nature." 107 F.3d at 414 (emphasis added). A sensible reading of this provision is that even a misdemeanor conviction for prostitution would justify a five-year prohibition upon receiving a license. The Court concludes that both *Deja Vu* and *DLS* support the Ordinance's five-year proscription for certain offenses, either felony or misdemeanor.

2.

■ The Court must next examine the substantive disabling offenses. *Deja Vu* and *DLS* both upheld ordinances that specified crimes of a sexual nature to be disabling offenses. *See* 274 F.3d at 392, 107 F.3d at 414. Accordingly, the majority of the Ordinance's disabling offenses are clearly permissible for inclusion, including: prostitution, solicitation, distribution of obscene material to a minor, use of a minor to produce, promote, or distribute obscene material, pandering, and other sexual offenses.

The only remaining offenses that require inquiry are gambling (§ 111.004(C)) and controlled substances violations (§ 111.004(C), (J)(2), (K)(4), and (K)(10)(b)). Nashville's ordinance specified only sexual offenses as disabling, and *Deja Vu* emphasized that the "narrow reach" of the provisions was an important factor in the court's decision. *See* 274 F.3d at 392. *DLS*, however, approved a broader class of disabling offenses, and *Deja Vu* made no effort to disturb this prior holding. More specifically, in addition to prostitution, obscenity, or "other crime[s] of a sexual nature," *DLS* upheld the use of moral turpitude as a disabling offense. *See id.* at 414–15. Thus, the Sixth Circuit has already approved a much broader and less specific disability provision than that contained in Louisville's Ordinance.

Therefore, the inclusion of non-sex crime disabling offenses in the Ordinance does not offend the Constitution.

### 3.

The third factor—the relationship between the disabling offense and the secondary effects targeted by the Ordinance—bolsters the conclusion from the first two. To void the Ordinance's use of gambling and narcotics convictions as disabling, this Court must assume that no tie exists between these offenses and the adverse secondary effects the City seeks to prevent. "The Supreme Court has recently noted that 'crime and other public health and safety problems are caused by the presence of nude dancing establishments....'" *Deja Vu,* 274 F.3d at 392 (quoting *Pap's A.M.,* 529 U.S. at 300, 120 S.Ct. 1382). It is entirely plausible for a municipality to find that establishments featuring erotic dancing not only produce additional crime in the form of sexual offenses, but generate illicit gambling and narcotics crime as well. If the Sixth Circuit has seen fit to approve moral turpitude, a fairly inclusive crime, as a disabling offense, then the specific offenses of gambling and drugs should be permissible as well.

### C.

 Plaintiffs argue that the Ordinance's "strict liability" provision improperly creates an irrebuttable presumption that violates their due process rights under the Fourteenth Amendment. Plaintiffs rely exclusively on an unpublished Sixth Circuit opinion, *Lee v. City of New-port,* 1991 WL 227750 (6th Cir. Nov.5, 1991), which invalidated a similar provision. In that case liability was impermissibly "strict" because it allowed the city to deprive a licensee of a protected property interest without any requirement of knowledge by the licensee, and without allowing the licensee to introduce evidence in his or her defense. *See id.*

Subsection 111.003(L)(1) of the Ordinance provides that "[a]ny act or omission by an entertainer, dancer, employee and/or patron constituting a violation of this section shall be deemed the act or omission of the owner or operator for [the] purpose[s] of determining whether the owner's or operator's license shall be revoked, suspended or renewed." On its face, this provision does not impose a disfavored irrebuttable presumption. It states only that any act or omission by a non-owner will be deemed an act or omission of the owner "for the purposes of determining" whether a license should be revoked, suspended, or renewed. It is but one factor among many in revocation, suspension, or renewal proceedings. To impute acts of an employee under the noncontroversial principle of respondeat superior is not conclusive as to liability under the Ordinance.

This interpretation is supported by reading § 111.003(L)(1) in conjunction with § 111.005, which applies to such proceedings. Not only does § 111.005(B) contain a knowledge requirement, it also offers ample opportunity for a licensee to present evidence in his or her defense.[11] The Ordinance differs from the ordinance in *Lee*

---

11. Subsection 111.005(B) provides:

At any hearing ... the Director shall consider all relevant factors, including:

(1) The willfulness of the owner's or operator's failure to comply with the applicable restrictions, requirements, and conditions and the willfulness of the failure of the individual designated on the licensee's application to undertake such compliance;

(2) The extent to which such failure to comply has been repeated by the owner or operator ...

(3) Any mitigating circumstances which the owner has shown has made compliance impracticable or impossible; and

(4) Whether the owner or operator has remedied the failure to comply prior to the hearing.

in all material respects. The extensive opportunities to rebut any imputation of wrongdoing by others on the premises to the owner or operator demonstrates that liability here is not "strict." The Court concludes that these provisions do not offend Plaintiffs' due process rights.

## D.

■ Plaintiffs next argue that requiring establishments to agree to submit to periodic inspections in order to receive a license violates their Fourth Amendment right against warrantless searches and imposes an unconstitutional condition upon the exercise of their First Amendment rights. Subsections 111.004(E) and (K)(6) both state: "[a]pplication for or granting of a license according to this section is deemed to permit periodic inspections of the public areas of any establishment requiring a license under this subchapter *for the purpose of verifying compliance with the terms and conditions of this subchapter.*"

The Fourth Amendment's warrant requirement extends to administrative searches, *see Camara v. Municipal Court,* 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and to commercial establishments, *see Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). The Supreme Court has recognized an exception to the warrant requirement when the target of the search is a "closely regulated" industry, but warrantless searches of even closely regulated businesses must be "carefully limited in time, place, and scope." *See New York v. Burger,* 482 U.S. 691, 700–03, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). In *J.L. Spoons, Inc. v. City of Brunswick,* 49 F.Supp.2d 1032, 1040 (N.D.Ohio 1999), a district court in this circuit recently found that a provision similar to that challenged here ran afoul of the Fourth Amendment, stating that it was "virtually limitless, and fail[ed] to curb the discretion of inspectors

'in time, place, and scope.'" *Id.* at n. 7 (citing *Burger,* 482 U.S. at 702–03, 107 S.Ct. 2636).

The City argues that the Ordinance's periodic inspections are limited in place and scope—because they extend only to "the public areas" of an establishment—and further asserts that the Ordinance was modeled upon the regulatory scheme upheld in *Ellwest Stereo Theater, Inc. v. Boner,* 718 F.Supp. 1553 (M.D.Tenn.1989). However, in that case the challenged ordinance provided for "unlimited inspections, *at reasonable times.*" *Id.* at 1557 (emphasis added). Louisville's Ordinance contains no such limitation upon the time of searches, and the City has not issued any interpretive regulations limiting inspections to business hours.

As in *J.L. Spoons,* this Court should not simply presume that the City will enforce the Ordinance in a constitutional manner. This defect may seem minor, but the paramount importance of Plaintiffs' First and Fourth Amendment rights makes the permissive language of the Ordinance significant. Moreover, this defect is easily correctable; the addition of one simple phrase—"at reasonable times"—would remove the potential Fourth Amendment implications.

## E.

■ Plaintiffs contend that the Ordinance's licensing fees are unconstitutional because they are too high and impose an unjustified constraint upon the exercise of First Amendment rights. The Ordinance establishes the following annual fees: $5,000 for adult cabarets (§ 111.004(I)), $3,000 for cabarets (§ 111.004(K)(9)), and $100 for both adult cabaret entertainers and cabaret entertainers (§ 111.004(J)(2), (K)(10)(b)).

The principles governing whether a licensing fee is permissible are well-estab-

lished. A municipality may not impose a tax on the exercise of constitutionally protected activity. However, it may impose a fee "to meet the expense incident to the administration of the [licensing act] and to the maintenance of the public order in the matter licensed." *Cox v. New Hampshire*, 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). In *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the Supreme Court invalidated a city ordinance that required payment of a flat fee for a license to distribute literature in public areas. The regulation differed from that in *Cox* because "[i]t [was] a license tax—a flat tax imposed on the exercise of a privilege granted by the Bill of Rights . . . fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues," and "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." *Id.* at 113–14, 63 S.Ct. 870. More recently, in *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), the Supreme Court invalidated a city ordinance in which the fee for a license to demonstrate on public lands was to be set according to the circumstances of each application, but not to exceed one thousand dollars per day. The Court found that the "fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content," and that "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Id.* at 134, 135, 112 S.Ct. 2395 (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)).

The municipality bears the burden of presenting evidence that its fee is necessary to defray the cost of administering the regulatory scheme. *See Bright Lights, Inc. v. City of Newport*, 830 F.Supp. 378, 385 (E.D.Ky.1993) (citing *Ellwest Stereo Theater*, 718 F.Supp. at 1574). The City of Louisville has failed to meet this burden. In its post-hearing brief, the City devotes a completely inadequate four sentences to justifying its licensing fees.[12] While the City conclusorily refers to its "evidence," it fails to explain the amount or nature of its costs, or indicate where in the record this material may be located.

The Court marshaled the evidence, as the City should have, and found that only Exhibits 13 and 14 address the issue. These exhibits are memoranda to the City's Department of Law estimating the costs associated with enforcing the Ordinance. Exhibit 13 provides the base yearly salaries of the eight officers in the City's vice squad, and explains that, under the old Ordinance, the detectives devoted approximately 20% of their working hours to related investigative activities. The memo also remarks, however, that it does not purport to offer an "exact figure," because enforcing the new Ordinance—still a proposal at the time this memo was written in September 1998—would require even greater amounts of the officers' time. The

---

12. Stated the City:

It is agreed that the law is well established that the amount of a license fee can be no more than is necessary to compensate for the cost of issuing and supervising the license to include the cost of law enforcement. *Broadway Books, Inc.*, supra; *TK's Video, Inc.*, supra.

The City provided evidence of what it said were its costs to issue the license and to inspect and enforce the license regulations. While plaintiffs would argue that the City has failed to substantiate these costs, the plaintiffs have utterly failed to provide any evidence to dispute or rebut the City's claimed costs. As such, those costs stand as reasonable.

Defs.' Post–Hearing Mem., at 23–24.

memo also states that it does not include overtime costs, court pay expenditures, or vehicle maintenance expenses. Exhibit 14 is more specific, offering a detailed breakdown by the City's licensing department of expected resource allocation, and projecting that the annual cost of licensing twenty establishments and 200 dancers would be $52,084.80.

What these documents do not contain, however, is any semblance of a comprehensive explanation of how the City utilized these figures to arrive at the specific $5,000, $3,000, and $100 fees for the different types of licenses.[13] The Court need not conclude, and cannot on this evidence, that these license fees do tax expression. However, the City's proof falls far short of the necessary detailed evidentiary showing that the licensing fees were carefully tailored to the cost of maintaining the regulatory scheme.[14]

Should the City elect to reconsider or justify its license fee structure, it might well attend to another troubling anomaly: the inexplicable distinction between the $5,000 fee for adult cabarets and $3,000 fee for cabarets. The substantive criteria for issuing both types of licenses are practically identical. To Plaintiffs' contention that

the fee difference is arbitrary, the City offered no response. Absent any detailed proof on this point, the curious variation in the fees charged to adult cabarets versus cabarets appears perilously close to being a distinction based upon the content of the speech (nude versus nearly nude dancing), and not upon any legitimate difference in the cost of administering the licensing scheme for the respective establishments. *Cox, Murdock,* and *Forsyth* clearly prohibit as much.

On the record in this case, therefore, the Court must enjoin enforcement of the license fee provisions.

F.

■ Finally, Plaintiffs argue that the Ordinance's penalty provision, § 111.008, in conjunction with the Ordinance's license revocation and suspension provisions, § 111.005, together violate the Constitution's prohibition on double jeopardy.[15]

The Double Jeopardy Clause of the Fifth Amendment "protects only against the imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States,* 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (citation omit-

---

**13.** Director Schreck did testify about both Exhibits 13 and 14, but did not provide any information on this critical point. *See* Tr., Volume II, at 120–30.

**14.** For example, in *Bright Lights,* the District Court for the Eastern District of Kentucky upheld a licensing fee of a similar amount— $5,000—for adult entertainment establishments, but in that case the city had submitted "extensive surveys and figures" in support of its legislative determination. 830 F.Supp. at 385. More specifically, the city introduced figures describing the discrepancy between policing and surveillance costs, on the one hand, and revenue raised by alcohol licensing fees, on the other. The city also provided statistics regarding the total number of criminal convictions committed on the premises of adult entertainment establishments over an

eight-year period, as well as the number of convictions for the specific offenses targeted as secondary effects by the ordinance. In sum, the court found that "the undisputed figures indicate that the $5,000.00 fee was devised *nearly precisely* to meet the expenses of the City's additional policing measures." *Id.* at 386 (emphasis added). No such attempt at precision has been proven here.

**15.** Section 111.008 provides that "[a]ny person who violates any provision of §§ 111.001– 111.005 shall be guilty of a misdemeanor and on conviction shall be punished by a fine of not less than $50.00 nor more than $100.00 or imprisonment not to exceed 50 days, or both, for each offense." Section 111.005 sets forth the myriad procedural steps and substantive grounds to guide the Director's decision to suspend, revoke, or renew a license.

ted). Plaintiffs expend considerable effort arguing that the penalty provisions of § 111.008, particularly the monetary fines, constitute criminal punishment. However, Plaintiffs devote unduly short attention to first establishing that the license suspension and revocation provisions of § 111.005 implicate the Fifth Amendment. Indeed, Plaintiffs only conclusorily assert, without the support of any case law, that the denial of a license deprives a person of the ability to exercise his or her First Amendment rights, purportedly a penal deprivation for the purposes of double jeopardy analysis. The Supreme Court recently reiterated that it has "long recognized that revocation of a privilege voluntarily granted, such as a debarment, is characteristically free of the punitive criminal element." *Hudson,* 522 U.S. at 104, 118 S.Ct. 488 (quotation marks, citation omitted).

Applying the rationale from *Hudson,* the Court concludes that the Ordinance's penalty provisions do not violate the Double Jeopardy Clause of the Fifth Amendment.

## IV.

Plaintiffs' remaining major challenge to the Ordinance is that its application process imposes an unlawful "prior restraint" by conditioning their right of expression upon the initial approval of public officials. Prior restraint jurisprudence is fertile ground for First Amendment litigation, and an abundance of precedent guides this Court's analysis. This task is complicated because, as the Court will outline in subsection A, prior restraint doctrine, at least within the Sixth Circuit, has not developed in an entirely consistent fashion. Still, under all Sixth Circuit case law this much is clear: the Ordinance is procedurally deficient for the reasons set out in subsection B. Less obvious is whether *any* municipality in the geographic confines of the Sixth Circuit may craft a licensing scheme that would pass constitutional muster. As a

service to the parties, the Court will address that question in subsection C.

## A.

Any analysis must begin with *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), in which the Supreme Court invalidated the state's statutory scheme for censoring motion pictures. In so doing, the Court held that a system of prior restraint was constitutionally permissible only if administered under three "procedural safeguards." *Id.* at 58, 85 S.Ct. 734. First, the decision whether to issue a license must be made "within a specified brief period" of time, and the status quo must be maintained until a "final judicial determination on the merits." *Id.* at 59, 85 S.Ct. 734. Second, "the procedure must also assure a prompt final judicial decision." *Id.* Finally, "the burden of proving that the film is unprotected expression must rest on the censor." *Id.* at 58, 85 S.Ct. 734.

The Supreme Court revisited *Freedman's* procedural safeguards in *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), as applied to a city licensing system regulating sexually oriented businesses. Justice O'Connor's plurality opinion, joined by Justices Stevens and Kennedy, found that *Freedman's* censorship scheme allowed the exercise of discretion over the content of protected speech, whereas a licensing scheme merely reviews the general qualifications of each applicant. *See id.* at 229, 110 S.Ct. 596. Thus, "the First Amendment does not require that the city bear the burden of going to court to effect the denial of a license application or that it bear the burden of proof once in court." *Id.* at 230, 110 S.Ct. 596. Although this view garnered the votes of only three justices, six members of the Court believed that at least the other two *Freedman* safe-

guards should apply to municipal ordinances regulating sexually oriented businesses. *See id.* at 238–39, 110 S.Ct. 596 (Brennan, J., concurring in the judgment). Applying this standard, the Court struck down the Dallas licensing system, which required issuance of a license within thirty days after the receipt of an application, but only after the business had passed a number of inspections.. The ordinance set no time limits for completion of these inspections, and the applicant could not compel the agencies to act within the thirty day post-application period. Thus, concluded the plurality opinion, such a scheme "allows indefinite postponement of the issuance of a license," and "also fails to provide an avenue for prompt judicial review so as to minimize suppression of the speech in the event of a license denial." *Id.* at 227, 229, 110 S.Ct. 596.

Five years later, the Sixth Circuit first applied *FW/PBS* in *East Brooks Books,* invalidating· a Memphis adult entertainment regulation which provided that adverse administrative decisions be appealed by common law writ of certiorari. Tennessee law did not require that such appeals be heard expeditiously, and this potential for "indefinite delays" led the Sixth Circuit to conclude that the Memphis ordinance did not feature a "guarantee of prompt judicial review" as required by *Freedman* and *FW/PBS.* 48 F.3d at 224–25. Interestingly, the court rejected the plaintiff's argument that the Memphis ordinance also failed the *Freedman–FW/PBS* status quo requirement as applied to new sexually oriented· business license applications. The panel rationalized that:

> [t]he status quo for a business seeking ·a permit to begin operating a sexually oriented business ... is non-operation. The city, therefore, does not need to allow operation pending review. Additionally, the ordinance has been amended to allow sexually oriented businesses in operation at the time the ordinance

becomes effective to continue operating while their applications are pending. At least · in the case of permit denial, [*Freedman–FW/PBS*] does not require more.

*Id.* at 225. This observation—and subsequent panels' deviation from it—create one of the central analytic quandaries in this case.

Five years after *East Brooks Books,* in *Nightclubs, Inc.· v. City of Paducah,* 202 F.3d 884 (6th Cir.2000), the Sixth Circuit once again enjoined a licensing scheme due to its inadequate procedural safeguards. The court noted the continued viability of *Freedman—FW/PBS,* and framed the relevant test as follows:

> a licensing scheme must remove standardless discretion from government officials and contain two procedural safeguards: (1) the decision whether to issue a license must be made within a specified brief period, and the status quo must be maintained· during that period and during judicial review, and (2) there must be a "guarantee of ·prompt judicial review."

*Id.* at 890 (citing *East Brooks Books,* 48 F.3d at 225). The Paducah ordinance failed this test in all respects. First, as in *FW/PBS,* the ordinance did not specify a time period ·for completion of the required inspections, or preserve the status quo during the administrative process and judicial review. *See* 202 F.3d at 890–91. Second, it did not guarantee that judicial review would be prompt. The ordinance did provide for; appeal of an adverse administrative decision "in any court of competent jurisdiction." However, Kentucky law contains no provision for such an appeal. Instead, it provides for filing "an original action," but offers no certainty of a prompt decision. *See id.* at 891–92.

While emphasizing the requirement of prompt judicial review and not merely the

theoretical possibility of it, the Sixth Circuit candidly acknowledged the difficulty of imposing this requirement upon local legislative bodies:

> Quite obviously, a municipality has no authority to control the period of time in which a state court will adjudicate a matter. Indeed, a city does not even possess the authority to create a mere "avenue" for prompt judicial review; the availability of judicial review is, in effect, dependent upon state law. We recognize that, as a practical matter, the requirement of prompt judicial review means that a city seeking to impose a licensing scheme must take certain steps to avoid constitutional infirmities. Specifically, a city may very well have to go beyond merely maintaining the status quo and actually permit the communication of protected expression until a judicial decision is rendered on a matter. For example, an ordinance could provide that a license shall issue if a reviewing court fails to reach a decision within a reasonably brief period of time. Similarly, a city could also issue provisional licenses to those businesses and employees who choose to seek judicial review of license denials.[16]

In sum, the Sixth Circuit in *Nightclubs* not only reaffirmed the procedural safeguards set forth in *Freedman, FW/PBS,* and *East Brooks Books,* but also offered a number of prescriptive solutions for meeting those safeguards.

Only one year later, in *Deja Vu,* another Sixth Circuit panel considered similar issues. In that case, the challenged ordinance provided that:

---

[a]ny denial of an application for a license may be immediately appealed to the circuit or chancery courts of Davidson County. The metropolitan department of law may institute proceedings for a declaratory judgment. If the applicant chooses to appeal by filing a writ of certiorari, then the metropolitan government shall file the record of all proceedings with the court within ten days from the date the metropolitan government was served with a petition for a writ of certiorari.

*Id.* at 401. Tennessee law required a court granting certiorari to an appeal of an administrative decision impeding First Amendment expression to hear and issue a decision in the case within forty days. *See id.* Nevertheless, *Deja Vu* held that the ordinance could not be sustained under *Freedman.* In Tennessee, the issuance of a common law writ of certiorari is discretionary, and not a matter of right. The court concluded that, "[w]ithout some affirmative evidence showing that every writ of certiorari will be granted ... the Ordinance's judicial review provision does not guarantee prompt judicial review, as required by the First Amendment." *Id.* at 402.

As to *Freedman's* other procedural safeguard—maintenance of the status quo—*Deja Vu* included a footnote stating: "[t]he Ordinance does preserve the status quo by allowing existing businesses to continue to operate until an adjudication on the merits and by issuing a temporary license to new businesses if the court fails to rule within forty days of the filing of an appeal." *Id.* at 402 n. 8. Nevertheless, the court further stated in this same footnote that:

---

16. *Id.* at 893–94 (internal quotations, citations omitted). The court also suggested "other measures that a city may institute to help ensure that judicial review will be expeditious," including "provid[ing] that an administrative transcript must be submitted to a

court within a brief, specified period of time," and "petition[ing] their state legislatures to pass laws that would obligate state courts to resolve municipal administrative appeals within a reasonably short period of time." *Id.* at 894.

*Merely preserving the status quo, however, is not sufficient to satisfy* Freedman. The decision whether or not to grant a license must still be made within a specified, brief period, and the licensing scheme "must *assure* a prompt judicial decision." The Ordinance's discretionary appeals procedure fails to satisfy these separate requirements.

*Id.* (quoting *Freedman,* 380 U.S. at 59, 85 S.Ct. 734) (first emphasis added, second in original).

*Deja Vu's* footnote undoubtedly conflicts with *Nightclubs'* suggested methods for writing a constitutionally permissible ordinance.[17] It adds confusion to an already difficult analysis. Fortunately, these differences do not present a great obstacle for the Court's analysis of the Louisville Ordinance.

### B.

Clashing dicta aside, the respective holdings of *East Brooks Books, Nightclubs,* and *Deja Vu* are absolutely clear on one issue: the licensing procedures challenged here are unconstitutional.[18] Louisville's Ordinance neither preserves the status quo pending a final judicial determination on the merits nor guarantees a prompt judicial decision. The Court will discuss each issue in turn.

### 1.

■■■ Discerning whether the Ordinance maintains the status quo during judicial review necessarily requires the Court to first define "status quo." Plaintiffs argue that the status quo must be the exercise of one's First Amendment rights. The City maintains that, at least in the case of an application for a new license, the status quo is the non-operation of the right. Sixth Circuit case law directly supports the City's interpretation. *See East Brooks Books,* 48 F.3d at 225 ("[t]he status quo for a business seeking a permit to begin operating a sexually oriented business ... is non-operation. The city, therefore, does not need to allow operation pending review."). As for license renewals, the ordinance examined in *East Brooks Books* had been "amended to allow sexually oriented businesses in operation at the time the ordinance [became] effective to continue operating while their applications [were] pending." *Id.* In other words, if the business is already operating, the status quo is continued operation of the right.

Our case presents a slightly different situation. The Ordinance grants temporary licenses, but only for a limited duration. If the required inspections are not completed within thirty days, a provisional license shall issue to an establishment, but will be effective for only thirty days or until the required inspections are completed, whichever comes first. *See* § 111.004(C), (K)(4). For entertainers, if the required police report has not been received within fifteen days, a provisional license shall issue to an entertainer, but will be effective for only fifteen days or until the report is received, whichever comes first. *See* § 111.004(J)(2), (K)(10)(b). Thus, a temporary license will expire after thirty or fifteen days, with no assurance of renewal. The Court finds as

---

**17.** *Nightclubs* posited that, by automatically issuing licenses if the reviewing court did not announce its decision within a specified brief period of time, or by issuing provisional licenses during the pendency of the judicial review period, a municipality might meet the *Freedman* test. *Deja Vu's* footnote indicates that even these steps would be insufficient, because interim measures involving temporary or provisional licenses fail to address how promptly the judicial review process will conclude.

**18.** In all fairness to the City, the Court notes that *Deja Vu* was decided and filed in December 2001, two months after the City passed the most recent amendments to the Ordinance.

a matter of law that as soon as a temporary license is issued, the status quo changes from non-operation to operation. Once issued, the City cannot take away the license arbitrarily.

The City says that it intends to maintain the status quo by perpetually reissuing temporary licenses at the close of each thirty or fifteen day period as needed. The Court has no reason to doubt this promise. Nevertheless, when examining discretionary acts which may impose a prior restraint on protected speech, the Court must "neither presume that municipal officials will act in good faith and respect a speaker's First Amendment rights, nor read a requirement into an ordinance that is not fairly and evidently present." *Nightclubs*, 202 F.3d at 890–91 n. 6 (citations omitted). As noted earlier in this Opinion, if a law affecting First Amendment rights is readily susceptible to a narrowing construction that would make it facially constitutional, it should withstand a facial challenge. *See American Booksellers*, 484 U.S. at 387, 108 S.Ct. 636. However, the Court cannot accept the City's proffered limiting construction, absent an authoritative ruling by a state court, as it is bound to "follow the general rule that a federal court may not supply new limiting language for a state statute to create constitutionality." *Eubanks v. Wilkinson*, 937 F.2d 1118, 1120 (6th Cir.1991).

In order to uphold this provision of the Ordinance, the Court must either eliminate the language delimiting the validity of the

temporary licenses to thirty or fifteen days, or graft additional language providing that if a temporary license expires before the required inspection or report is submitted, the Director shall perpetually issue additional temporary licenses. Courts must be cautious about rewriting statutes to create constitutionality. Here, the "rewriting" necessary is too extensive to make the Ordinance "readily susceptible" to limitation.

2.

■■■ The Ordinance also does not guarantee the kind of prompt judicial review of an administrative decision which the Sixth Circuit requires. Section 111.004, titled "Licensing," says very little about judicial review. As to establishments, it provides that in the event of a denial, the Director shall "inform[ ] the applicant of the appeal procedure if the applicant does not agree with the Director's decision." § 111.004(C), (K)(4). The Ordinance neither explains these procedures nor provides that they be administered properly. As to individuals, the Ordinance does not even reference the availability of judicial review for denied entertainer licenses.

The plain language of § 111.005(F), as informed by the title of the section, applies only to the suspension, revocation, or refusal to renew a license, not the denial of a new license application.[19] Subsections 111.005(A)-(D) are expressly limited to appeals of refusal to renew or suspension decisions. Subsection 111.005(E) address-

---

**19.** Section 111.005 covers "Administration; suspension, revocation; or refusal to renew a license; severability," and § 111.005(F) describes a more detailed scheme for judicial review:

The findings and rulings of any hearing before the Director shall become final 30 days after the date of the Director's findings and rulings unless appealed to a court of competent jurisdiction. If an appeal is taken within the 30 days, the findings and

rulings of the Director shall be sta[y]ed during the pendency of any such appeal unless otherwise ordered by the court.

The title does reference "administration," but nothing in the text of the section indicates that this refers to any proceedings other than decisions affecting existing licenses. The City has produced no evidence to persuade the Court otherwise. To that end, the title also references "severability," but nothing in the section addresses this stated issue, either.

es notice requirements when the Director determines to hold a hearing "pursuant to this section." The only remaining subsection is § 111.005(G), which empowers the Director to enact "whatever rules and regulations are deemed necessary for the orderly and complete administration of this subchapter." Director Schreck testified that, to date, he has not promulgated any administrative rules or regulations. Ultimately, no part of § 111.005 mentions, either explicitly or implicitly, the denial of new license applications made under § 111.004.

Likewise, nothing in § 111.004 references a right to a hearing. While both § 111.004(C) and (K)(4) nebulously state that establishments whose applications for a new license are denied have the right to appeal, neither subsection provides for this appeal in the form of a hearing before the Director. Moreover, § 111.004 is silent as to the appellate rights of individual entertainers whose applications for a new license are denied.

This lack of specificity falls far short of the "guarantee" of prompt judicial review repeatedly emphasized as necessary by the Sixth Circuit. *See Deja Vu,* 274 F.3d at 401; *Nightclubs,* 202 F.3d at 891–94; *East Brooks Books,* 48 F.3d at 224–25. The theoretical possibility of expeditious judicial review is not constitutionally sufficient. *Nightclubs,* 202 F.3d at 892. In the following subsection C, the Court discusses the ways in which the City might meet these requirements. That discussion cannot change the conclusion that in our circumstances *Freedman* and *FW/PBS* require that a licensing scheme guarantee prompt judicial determination on the merits of the administrative decision.

In summary, the Ordinance imposes the restraint, without guaranteeing the prompt review. Accordingly, the new license provisions of § 111.004 must be enjoined.

## C.

When read together, *Nightclubs* and *Deja Vu* abstractly approve the regulation of sexually oriented businesses. But, in the process of examining the individual ordinances, the Sixth Circuit has announced a standard that is essentially impossible to meet. This presents a very real difficulty for municipalities which sincerely seek to enact a lawful regulation.[20] While judicial opinions are mandates, they are also part of a continuing conversation between the judiciary and elected officials. Hopefully our opinions enhance and inform the ongoing democratic process. *See Stengel,* 28 F.Supp.2d at 1043. While courts should be reluctant about giving advice to elected bodies, the history of litigation on this subject suggests that some guidance might be useful and appreciated. Cautiously, the Court offers that guidance.

The Court believes that addressing a license decision as follows should withstand constitutional challenge. If a license application is approved, no restraint on speech is imposed; *Freedman's* guarantee of prompt judicial review is not implicated. If a license application is denied, immedi-

---

**20.** The subject matter itself creates genuine analytic difficulty. As fate would have it, in the short time span of these cases, a large number of judges participated in the decision-making. Eight different judges sat on the panels in *East Brooks Books, Nightclubs,* and *Deja Vu. East Brooks Books* was authored by Judge Kennedy, and joined by Judges Suhrheinrich and Hood (sitting by designation). *Nightclubs* was written by Judge Aldrich (sit-

ting by designation), and joined by Judge Clay. Judge Merritt dissented. *Deja Vu* was written by Chief Judge Martin, and joined by Judge Suhrheinrich. Judge Wellford concurred in part and dissented in part. Only two of these judges are presently active members of the Sixth Circuit. Therefore, one cannot easily predict how the next Sixth Circuit panel would view these issues in slightly different circumstances.

ately upon its appeal the municipality must issue a provisional license allowing the applicant to exercise his or her First Amendment rights throughout the final judicial review of the denial decision. For the reasons that follow, in these circumstances, no restraint on speech is imposed, and *Freedman's* guarantee of prompt judicial review should not be implicated.

Indefinite preservation of the status quo—assuming the status quo is the exercise of one's First Amendment rights, as it was in *Deja Vu*—vitiates both the actual imposition of a prior restraint, as well as the attendant harms. As stated by the Supreme Court is *FW/PBS*, "[o]ur cases addressing prior restraints have identified two evils that will not be tolerated" when a licensing scheme effects a prior restraint on protected speech. 493 U.S. at 225, 110 S.Ct. 596. "First, a scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *Id.* at 225–26, 110 S.Ct. 596 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). Conversely, a system in which a provisional or temporary license must issue immediately upon the appeal of an administrative decision would seem to pose no such threat. So long as an applicant may speak while a court reviews a government official's adverse license decision, censorship does not result. "Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *Id.* at 226, 110 S.Ct. 596 (citations omitted). This is because, "[l]ike a censorship system, a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license." *Id.* However, the prior restraint, in fact, ceases to exist if during this entire time the applicant has a provisional license, and thus has the right to speak.[21]

Supreme Court precedent supports this Court's more logical reading of *Deja Vu's* eighth footnote. In fact, a close reading of *Freedman* and *FW/PBS* makes clear that not every licensing decision should implicate the dual procedural safeguards of maintaining the status quo and assuring prompt judicial review, as intimated by *Deja Vu*. Rather, municipalities need guarantee a speedy judicial determination on the merits only if the status quo involves the restraint of the exercise of one's First Amendment rights. To demonstrate the scope of *Freedman's* procedural safeguards, the Court must return to *FW/PBS*, where the Supreme Court summarized that:

> In *Freedman*, we determined that the following three procedural safeguards were necessary to ensure expeditious decisionmaking by the motion picture censorship board: (1) *any restraint* prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of *that decision* must be available; and (3) the censor must bear the burden of proof once in court.

493 U.S. at 227, 110 S.Ct. 596 (citing *Freedman*, 380 U.S. at 58–60, 85 S.Ct. 734) (emphasis added). The italicized portions of this statement make clear that prompt judicial review is necessary where a licensing decision or process imposes a restraint on one's speech. *Freedman* requires

---

**21.** One could argue that the imposition of any licensing application process acts as a prior restraint because having to endure that process alone either intimidates or chills the exercise of First Amendment rights. However, no court has ever held that to be the case in circumstances such as these.

prompt judicial review only in those instances where a license denial "results in the unconstitutional suppression of protected speech." *Id.* at 228, 85 S.Ct. 734.

An expansive reading of the *Deja Vu* footnote would make implementation of a constitutional licensing scheme a practical impossibility because municipalities lack the authority to guarantee prompt independent judicial review. Such an interpretation would contradict both the Supreme Court and the Sixth Circuit's general approval of municipalities' ability to license sexually oriented businesses. A more sound reading of *Deja Vu's* eighth footnote is that it only reaffirms the *Freedman–FW/PBS* requirement of prompt judicial review where a licensing decision operates as a restraint on speech, rather than expanding the requirement to circumstances where no restraint has occurred.

V.

▮▮▮▮ The sole remaining issue is whether to enjoin enforcement of the entire Ordinance, or merely sever those portions which the Court has declared invalid. "The Supreme Court has held that invalid portions of a statute should be severed unless it is clear that the Legislature would not have enacted those provisions which are constitutional, independent of those provisions which are not." *Plain Dealer Publ'g Co. v. City of Lakewood,* 794 F.2d 1139, 1147 (6th Cir.1986), *aff'd in part and remanded,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (citing *INS v. Chadha,* 462 U.S. 919, 931, 103 S.Ct. 2764,

77 L.Ed.2d 317 (1983)). "Moreover, a provision is presumed severable if what remains after severance is fully operative as a law." *Id.* (citing *Chadha,* 462 U.S. at 934, 103 S.Ct. 2764).

The specific portion of the City's Code of Ordinances that addresses sexually oriented businesses, Chapter 111, does not contain a severability clause.[22] The City argues that the Court should rely upon a different section of the Louisville Code of Ordinances, § 10.07, which provides for severability generally should any part of the overall Ordinance be held unconstitutional.[23] As a practical matter, however, partial operation of Chapter 111 post-severance is untenable. The Ordinance's basic purpose is to regulate sexually oriented businesses. Its primary method for doing so is its licensing and enforcement scheme. Although the Ordinance's substantive provisions are constitutional, they are actually but minor subsets of the broader licensing requirement. For example, enforcement of the "buffer zone" requirement presupposes that an entertainer has a license to dance and an establishment has a license to operate. If the City may not deny or revoke licenses—the fundamental regulatory mechanism upon which the Ordinance is structured—then enforcement of the Ordinance is impossible.

Moreover, the Sixth Circuit in *Deja Vu* has spoken precisely to these circumstances. It stated that "[t]he lack of a judicial review provision renders the entire statute facially unconstitutional, and there-

---

**22.** As noted in *supra* note 19, the title of § 111.005 references "severability," but nothing in the text of this section addresses the issue.

**23.** Section 10.07 of the Louisville Code of Ordinances provides:
 If any part of an ordinance is held unconstitutional, the remaining parts shall remain in force, unless the ordinance provides oth-

erwise, or unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the Board of Aldermen would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the Board of Aldermen.

fore, severing the effectual provision will not save the statute. Under these circumstances, we cannot give effect to the severability clause, but must enjoin enforcement of the entire Ordinance." 274 F.3d at 402–03. Because, like Nashville's ordinance, Louisville's Ordinance lacks a judicial review provision, it too is facially unconstitutional. For all these reasons, the Court must enjoin the enforcement of the entire Ordinance.

As a practical matter, the constitutional defects in the Ordinance's application and appeals procedures make enforcement of any remaining part of the Ordinance impossible. Therefore, the City may not enforce any part of the Ordinance which regulates cabarets, adult cabarets or the entertainers working therein.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Plaintiffs have moved to enjoin the enforcement of almost every part of LOUISVILLE CODE OF ORDINANCES §§ 111.001–.008. The Court has held an extensive hearing, reviewed the Memoranda of the parties and filed the accompanying Memorandum Opinion explaining its views.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiffs' motion for an injunction is SUSTAINED and the City of Louisville is enjoined from enforcing the current LOUISVILLE CODE OF ORDINANCES §§ 111.001–.008 as to cabarets, adult cabarets or the entertainers working therein.

This is a final and appealable order.

### AGREED ORDER

Come the Parties this date, by counsel, having reviewed this Court's Order entered 12 June 2002, sustaining the Plaintiffs' Motion for an Injunction and enjoining enforcement of the current Louisville Code of Ordinances, Sections 111.001–.008, as to cabarets, adult cabarets and the entertainers working therein; and

The Parties agreeing that the provisions of Section 111.003 (G), (H), (I), and (J) are not contingent upon the licensing provisions of Chapter 111 and that those provisions are therefore severable from the remainder of Chapter 111 and this Court's Order enjoining the enforcement of same, and the Parties further agreeing that a clarification of certain sections of this Court's previous Order is necessary to continue enforcement of certain zoning ordinances and requirements of the Development Code for all of Jefferson County; specifically, that Section 111.003 (G), (H), (I), and (J) are to be enforceable as land use regulations necessary to adult entertainment activities being permitted in the C–2 Commercial, C–3 Commercial and C–M Manufacturing zoning districts presently regulated under Section 9.4 of the Development Code for all of Jefferson County; and

The Court having reviewed this proposed Agreed Order executed by all counsel on behalf of their respective Parties, and the Court otherwise being sufficiently advised:

IT IS HEREBY ORDERED that the Joint Motion of the Parties **BE AND HEREBY IS GRANTED**; that this Court's Order entered on 12 June 2002 be and the same is hereby amended, and that Sections 111.003 (G), (H), (I) and (J) shall remain enforceable as they relate to the provisions of Section 9.4 and other district requirements of the current Development Code for all of Jefferson County in determining whether an adult entertainment activity may be permitted in certain zoning district classifications.